[No. 29878-0-I. Division One. May 23, 1994.]

THE STATE OF WASHINGTON, *Respondent*, v. NICOLE FAYE CARTER, *Appellant*.

*Kathleen Barry* of *Washington Appellate Defender Association,* for appellant.

*Norm Maleng, Prosecuting Attorney,* and *Jennifer K. Ryan Gilman,* and *Drew Zavatsky, Deputies,* for respondent.

AGID, J. — Nicole Faye Carter appeals her convictions of delivery of a controlled substance and possession of a controlled substance with intent to deliver on the grounds that the trial court erred in admitting evidence obtained through an illegal search, the prosecutor's closing arguments deprived her of a fair trial and the instructions given to the jury violated her right to be free from double jeopardy. We affirm.

## I

### FACTS

On March 15, 1991, the Seattle Police Department was conducting a buy-bust operation at the Sunrise Motel on Martin Luther King, Jr. Way in Seattle. Carter approached Officer Lawrence Jackson, who was posing as a narcotics buyer, in the parking lot of the Sunrise Motel. As Jackson was getting out of the car to approach somebody else, Carter said "soup" to him. Jackson asked her if she had some. She

said, "Yeah, come on". Another woman, later identified as Sonya Smothers, was with Carter.

Jackson accompanied the two women to a motel room. Smothers told him to close the door. Smothers then reached under her shirt, pulled out a small vial and opened it, dumping several rocks of cocaine into her hand. She picked one out and handed it to Jackson, indicating that if he needed more, he could come back. Jackson handed her a premarked $20 bill and took the cocaine. Jackson then left the room and signaled that there had been a "good buy" to other officers stationed nearby. He described the women who sold him the cocaine and said they were still in the room.

Officers Hazard, Gonzales, Rice, and Burns were members of the observation and arrest teams. They responded immediately when they got word of the "good buy" signal. Before they reached the motel room door, a woman opened it and stepped into the hall. When she saw the officers, she slammed the door and tried to run away. One of the officers detained her in the hallway.

Hazard tried the doorknob, which was locked. He announced, "Seattle Police" and forced the door open. There were three women inside. Smothers was holding a vial which contained 7.1 grams of rock cocaine and the premarked $20 bill. Jackson identified Carter and Smothers as the two women who had contacted him and sold him the cocaine.

The State charged Smothers with one count of delivery of a controlled substance, to which she pleaded guilty. The State also charged Carter with one count of delivery of cocaine.[1] Smothers was scheduled to be sentenced in September 1991, but the sentencing date was continued. Carter's trial was supposed to have begun on September 16, 1991, and Carter had subpoenaed Smothers to testify for the defense. Smothers' attorney informed Carter's attorney that Smothers would invoke her Fifth Amendment privilege against self-incrimination and refuse to testify. Carter moved to continue her trial date until after Smothers' sentencing. The trial court

---

[1]The State subsequently amended the information to include a second count against Carter for possession of cocaine with intent to deliver.

granted the motion, finding Smothers would retain her Fifth Amendment privilege until after she was sentenced. Carter waived her speedy trial rights, and the court quashed Smothers' subpoena.

Carter subsequently sought and received four more continuances. Each continuance was granted to allow Carter more time to secure the testimony of Smothers who, because of her failures to appear and continuances, had still not been sentenced. On November 18, 1991, the day Carter's trial was to begin, she informed the court that Smothers failed to appear for her most recent sentencing hearing. Carter requested another continuance and a material witness warrant for Smothers. The court issued the warrant but denied the motion for a continuance.

Carter's defense at trial was that it was not she, but another woman, who had accompanied Smothers to the parking lot of the Sunrise Motel to attract customers. Carter also testified she had merely stopped by the motel to pick up Smothers, with whom she had plans to go out that night. She said that she had a date with a man named Domingo, and she and Smothers were going to meet him. Neither Domingo nor any of the women in the motel room that night testified. The jury found Carter guilty of both charges. This appeal followed.

## II

### STANDING

Carter challenges her conviction of possession with intent to deliver on the ground that the trial court erred in denying her motion to suppress evidence obtained through the officers' warrantless entry into the motel room. The State contends that Carter lacks standing to challenge the entry.[2]

---

[2]The State did not raise this issue at trial. However, it is properly considered on appeal. *State v. Grundy*, 25 Wn. App. 411, 415-16, 607 P.2d 1235 (1980) (although the State may not raise the issue of a defendant's standing where it is an appellant, it may raise the issue for the first time on appeal as a respondent because the appellate court has a duty to affirm on any ground supported by the record, even if it is not the ground relied on by the trial court), *review denied*, 95 Wn.2d 1008 (1981).

# A
## Automatic Standing Under the Fifth Amendment

Carter argues that she has automatic standing to challenge the officers' warrantless, forcible entry into the motel room because she was charged with a possessory offense. Whether the doctrine of automatic standing remains viable under the Washington constitution is an unsettled question, because no state case has held that it survived *United States v. Salvucci*, 448 U.S. 83, 65 L. Ed. 2d 619, 100 S. Ct. 2547 (1980), which abolished the federal automatic standing doctrine. In *State v. Simpson*, 95 Wn.2d 170, 622 P.2d 1199 (1980), only four justices concluded that the state constitution's privacy clause supported the doctrine of automatic standing. More recently, in *State v. Zakel*, 119 Wn.2d 563, 572, 834 P.2d 1046 (1992), five justices concurred specifically to indicate that the court was not reaching the issue of whether the doctrine exists under the state constitution despite an extensive discussion of it in the lead opinion. In *State v. Jones*, 68 Wn. App. 843, 854, 845 P.2d 1358, *review denied*, 122 Wn.2d 1018 (1993), this court held that "there is no authority in Washington binding this court to apply automatic standing as a matter of state constitutional law", and declined to reach the issue because the appellant had not submitted a brief addressing the factors listed in *State v. Gunwall*, 106 Wn.2d 54, 720 P.2d 808, 76 A.L.R.4th 517 (1986). Carter has submitted a *Gunwall* brief, arguing that our constitution offers broader protection in this area than does the federal constitution and urging this court to hold that the automatic standing doctrine remains viable as a matter of state constitutional law.

Washington originally adopted the automatic standing doctrine established by *Jones v. United States*, 362 U.S. 257, 4 L. Ed. 2d 697, 80 S. Ct. 725, 78 A.L.R.2d 233 (1960), in *State v. Michaels*, 60 Wn.2d 638, 644-47, 374 P.2d 989 (1962). *Jones* and *Michaels* permitted a defendant whose personal privacy rights were not violated to nevertheless challenge the legality of a search or seizure which turned up evidence against her. In order to invoke automatic standing, however, the defend-

ant was required to show that possession is an " 'essential' element of the offense" and that she "was in possession of the contraband at the time of the contested search or seizure." *Zakel*, 119 Wn.2d at 568 (quoting the plurality in *State v. Simpson*, 95 Wn.2d 170, 181, 622 P.2d 1199 (1980)).[3]

The doctrine of automatic standing was abandoned under federal law because it no longer served the function for which it was created. The rule was designed to avoid the "'constitutional dilemma' of forcing a defendant charged with a possessory crime to chose between preserving" her Fifth Amendment privilege against self-incrimination or invoking her Fourth Amendment rights. *Jones*, 68 Wn. App. at 853. However, in *Simmons v. United States*, 390 U.S. 377, 19 L. Ed. 2d 1247, 88 S. Ct. 967 (1968), the United States Supreme Court held that a defendant's testimony in support of a motion to suppress is not admissible as evidence of guilt at trial. Consequently, in *Salvucci*, the Court abolished the federal automatic standing rule because, after *Simmons*, the risk of potential self-incrimination no longer existed.[4] The *Salvucci* Court, however, declined to decide whether a defendant's testimony at a suppression hearing could be used for impeachment purposes if the defendant testified, 448 U.S. at 93-94 & n.8, and no subsequent United States Supreme Court case has addressed this issue directly in the

---

[3]We note that, because the State need not prove that an accomplice to a possessory crime was in either actual or constructive possession of the contraband in order to convict her on an accomplice liability theory, Carter might not satisfy this threshold test in Washington for automatic standing, if indeed the doctrine were still viable. However, this issue was not briefed or argued by the parties. In addition, neither *Simpson* nor *Zakel* involved accomplice liability, so we presume the court did not have it in mind when it discussed the requirements for asserting automatic standing. Given the peculiar nature of accomplice liability for a possessory crime committed by the principal, we are reluctant to decide that automatic standing is unavailable on this ground without the benefit of briefing and argument by those affected by such a ruling.

[4]In *Salvucci*, the Supreme Court reaffirmed its holding in *Rakas v. Illinois*, 439 U.S. 128, 140, 58 L. Ed. 2d 387, 99 S. Ct. 421 (1978) that "an illegal search only violates the rights of those who have 'a legitimate expectation of privacy in the invaded place.' " 448 U.S. at 91-92. Thus, after *Rakas* and *Salvucci*, a defendant must have a reasonable expectation of privacy in the location searched or item seized in order to raise a Fourth Amendment challenge to a search or seizure. 448 U.S. at 92-93.

context of automatic standing. The risk of admitting self-incriminating testimony garnered at a suppression hearing under the auspices of impeachment evidence is the danger that prompted four justices in *Simpson* to conclude that the state constitution's privacy clause independently supported the doctrine of automatic standing. 95 Wn.2d at 177-81.[5]

*Simpson* and *Zakel* discuss the automatic standing doctrine in terms of whether our constitution's privacy clause is more expansive than its federal counterpart. However, the issue presented under the automatic standing doctrine is more accurately analyzed in terms of whether the state constitution is more solicitous of a defendant's privilege against self-incrimination than the federal constitution.[6] The concern addressed by the automatic standing doctrine is not whether a defendant has a privacy interest in the location searched or item seized,[7] but rather, whether requiring him or her to assert a possessory interest in a seized item at a suppression hearing in order to challenge the constitutionality of a search or seizure violates his or her privilege against self-incrimination where possession is an element of the crime with which he or she is charged.[8] Thus, we must determine whether the state constitution provides greater protection against self-incrimination, and, if so, whether

---

[5]The *Salvucci* Court did hint that suppression hearing testimony might be admissible to impeach a defendant by noting that "[t]his Court has held that 'the protective shield of *Simmons* is not to be converted into a license for false representations. . . .'" 448 U.S. at 94 n.9 (quoting *United States v. Kahan*, 415 U.S. 239, 243, 39 L. Ed. 2d 297, 94 S. Ct. 1179 (1974)). *See also United States v. Havens*, 446 U.S. 620, 64 L. Ed. 2d 559, 100 S. Ct. 1912 (1980); *State v. Greve*, 67 Wn. App. 166, 834 P.2d 656 (1992) (allowing the use of suppressed evidence for impeachment purposes to discourage perjury and further the truth-finding function of the trial), *review denied*, 100 Wn.2d 1005 (1993).

[6]*See Salvucci*, 448 U.S. at 90 ("[t]his Court has identified the self-incrimination rationale as the cornerstone of the *Jones* opinion").

[7]This is properly the concern of Fourth Amendment standing, a topic we address in section B, *infra*. *Salvucci*, 448 U.S. at 90-91; *Rawlings v. Kentucky*, 448 U.S. 98, 104-06, 65 L. Ed. 2d 633, 100 S. Ct. 2556 (1980).

[8]*See Brown v. United States*, 411 U.S. 223, 228, 36 L. Ed. 2d 208, 93 S. Ct. 1565 (1973) ("[t]he self-incrimination dilemma, so central to the *Jones* decision, can no longer occur under the prevailing [*Simmons*] interpretation of the Constitution").

using testimony solicited from a defendant at a suppression hearing to impeach him or her at trial is thereby prohibited.[9]

In other contexts under state law, a defendant's statements may be introduced for impeachment purposes as prior inconsistent statements, even though they may not be used as substantive evidence.[10] Our Supreme Court has held that the state constitutional protection against self-incrimination under article 1, section 9 provides no broader protection than that afforded by the federal constitution under the Fifth Amendment. *State v. Earls*, 116 Wn.2d 364, 374, 805 P.2d 211 (1991). In *Salvucci* the United States Supreme Court declined to reach the issue of whether the use of testimony given at a suppression hearing for impeachment purposes at trial implicated the Fifth Amendment. It nevertheless held that the automatic standing rule was no longer required to protect a defendant's Fifth Amendment rights because his or her testimony at a suppression hearing could not be used as substantive evidence against him or her at trial. 448 U.S. at 89-90. As the *Salvucci* Court observed, the question of whether incriminating statements made in a suppression hearing may be used as impeachment

> is quite different from the one of whether 'use immunity' extends only through the Government's case-in-chief, or beyond that to the direct and cross-examination of a defendant in the event he chooses to take the stand. That . . . is an issue which more aptly relates to the proper breadth of the *Simmons* privilege, and not to the need for retaining automatic standing.

448 U.S. at 94.

We agree with the analysis in *Salvucci*. The automatic standing doctrine is no longer necessary to protect a defendant's Fifth Amendment right against self-incrimina-

---

[9]We do not address the use of testimony from a suppression hearing for other purposes because, after *Simmons* and *Salvucci*, it is otherwise inadmissible.

[10]ER 613. *See* 5A Karl B. Tegland, Wash. Prac., *Evidence* § 255, at 303 (3d ed. 1989) (postarrest statements admissible for impeachment although they may be inadmissible as evidence of guilt under *Miranda*) (citing *State v. Holland*, 98 Wn.2d 507, 656 P.2d 1056 (1983)); *see also State v. Greve*, 67 Wn. App. 166, 834 P.2d 656 (1992) (previously suppressed statements obtained in violation of defendant's privacy rights are admissible under both federal and state constitutions for impeachment purposes), *review denied*, 121 Wn.2d 1005 (1993).

tion because his or her testimony cannot be used against him or her for purposes of determining guilt.[11] Because our state constitution provides no broader protection in this area than the federal constitution, it follows that the automatic standing doctrine is no longer viable as a matter of state law. Thus, we hold that Carter did not have automatic standing to challenge the officers' entry into the motel room.

## B
### Fourth Amendment Standing

██ Carter also argues that she has standing to challenge the constitutionality of the entry under the Fourth Amendment. In order to challenge a Fourth Amendment violation, the defendant must establish that she has both a subjective and an objective expectation of privacy in the area searched or item seized. *Jones*, 68 Wn. App. at 849-50. Although Carter may have had a subjectively reasonable expectation of privacy in the motel room, her expectation of privacy, if any, was not objectively reasonable.[12] Her own testimony at trial negates her Fourth Amendment standing argument. Carter testified that she was at the motel to pick up Smothers for a double date and that she waited in the room watching television while Smothers and another woman left the room and returned with Jackson. In order to show that she had an objectively reasonable expectation of

---

[11]If, after testifying at a CrR 3.6 hearing, he or she chooses to present conflicting testimony at trial, the trial court can determine in the first instance whether to extend the *Simmons* privilege to impeachment testimony or, as our courts have held in other contexts, see cases cited in footnote 10, allow impeachment based on the suppression hearing testimony. This situation did not arise at Carter's trial, and the competing policy questions have therefore not been briefed or argued. We will wait for a case squarely presenting the issue to address it further.

[12]Carter could arguably establish a subjectively reasonable expectation of privacy in the room because the curtains were drawn, the door was closed and there was no evidence of heavy traffic in that particular room. However, as in *Jones*, there is no showing from her testimony that she relied on these facts as the basis for her "actual (subjective) expectation of privacy in the searched premises." 68 Wn. App. at 850. In any event, in order to claim standing, she must be able to satisfy both the objective and subjective prongs of the reasonable expectation of privacy inquiry.

privacy in the room, a defendant must show more than "legitimate presence . . . with permission of the owner". *Jones*, 68 Wn. App. at 851. According to Carter's own testimony, she was merely in the room watching television; this is not sufficient to "manifest a personal privacy interest in the [room], because it is not premised on any claim to or apparent 'right' to exclude" others. *Jones*, 68 Wn. App. at 851-52. Carter clearly was not an overnight guest, and her short-term presence in the room establishes nothing more than "legitimate presence". Accordingly, we hold that Carter does not have standing under the Fourth Amendment to challenge the officers' entry into the motel room. Because Carter does not have standing to challenge the entry, any error committed below in denying her motion to suppress evidence was harmless. Therefore we do not reach the issue of whether the officers' warrantless entry into the motel room was justified by exigent circumstances.

## III
### PROSECUTORIAL MISCONDUCT

█ Carter also challenges her convictions on the ground that she was denied due process by virtue of the prosecutor's misconduct. Carter contends that the following statements by the prosecutor framed the case as a choice between finding her guilty or finding that the police and the prosecutor were involved in a conspiracy:

> The second theory that Defense counsel has brought before you is as I characterized it in my first closing argument, and as he still will not define it as such, but it is a conspiracy theory. Because officers' observation — officers testified consistent with Officer Jackson's testimony in what they saw.
>
> And the inference that well, Officer Stiner isn't here because she wouldn't go along with the conspiracy. I guess that's the inference. Be careful before you buy into that inference. Is there any evidence to indicate that that is in fact the proper inference?
>
> Officer Stiner, according to her — the description of what she was involved in in this incident, saw nothing more than Officer Jackson. Her testimony would have been repetitive. Just as Officer Gonzales' testimony as the partner of Officer Hazard would have been repetitive of his.

[DEFENSE COUNSEL]: Your Honor, I object to this argument.

[PROSECUTOR]: I'm drawing inferences, which I'm allowed to do.

THE COURT: I don't want any argument, counsel. The jury has been instructed, and you may continue.

[PROSECUTOR]: Ask yourself if the proper inference of the Defense are reasonable. Is it probable to believe that Officer Stiner is just hiding at home because she doesn't want to buy into what all these other guys said on the stand?

Later in rebuttal the prosecutor argued:

As far as the indicators of intent go, intent to deliver. Now I'm invocated [sic] in this conspiracy because the charge of possession with intent is different from that which Sonya Smothers was charged with. Somehow the inference is I got to Officer Jackson and said we need a statement here, we need a statement that said she intends to deliver these things. Ask yourself how plausible that is. Ask yourself if that's reasonable.

He testified as an officer before the Court, which undoubtedly he will have to appear before again. And do you think he would jeopardize his credibility by making things up? [13]

These comments were improper in that they suggested Carter was characterizing the officers as liars and conspirators. *See State v. Barrow*, 60 Wn. App. 869, 875, 809 P.2d 209, *review denied*, 118 Wn.2d 1007 (1991). Although Carter took the stand and generally denied any involvement in the crimes, nothing in her testimony suggests she believed she was being framed or that there was a conspiracy against her. Furthermore, her attorney did not argue a conspiracy theory to the jury. Rather, he challenged the reliability of Jackson's recollections and questioned the absence at trial of other officers involved in the operation. Thus, the prosecutor's argument was unprovoked and unwarranted.

 Carter also argues that the following argument was improper under the missing witness doctrine:

Conveniently, nobody is here to — there's Sonya, certainly. . . . She's unobtainable by any party. Maybe she would have come in here and taken the fall for her friend, but she's not present.

---

[13]Although Carter's attorney did not object again to this particular line of argument, given the judge's earlier comment, it is unlikely that another objection would have been successful.

Carter's objection to this statement was overruled.[14] Carter contends the above statement deprived her of due process because, by referring to the lack of defense witnesses to corroborate her version of events, the prosecutor shifted the burden of proof to her. The prosecutor's remarks concerning the absence of Sonya Smothers was improper under the missing witness doctrine. While it is permissible for the prosecution to argue, and the jury to draw, the inference that, where a defendant has failed to call a witness, the witness was not called because she would testify unfavorably to the defendant, this inference is not proper where the witness' absence is satisfactorily explained. *State v. Blair*, 117 Wn.2d 479, 488, 816 P.2d 718 (1991). Carter tried to produce Smothers for trial but was unsuccessful, and the prosecutor's remarks regarding her absence were improper.

■ Even where a prosecutor's arguments are improper, a defendant must still establish prejudice to warrant reversal of his or her conviction. Prejudice is established where there is a substantial likelihood that the misconduct affected the jury's verdict. *State v. Reed*, 102 Wn.2d 140, 145, 684 P.2d 699 (1984). Given the strong evidence of her participation in the sale of cocaine to Jackson, it is unlikely the prosecutor's remarks affected the verdict. Thus, the prosecutor's misconduct did not deprive her of a fair trial.

---

[14]Carter also points to the following missing witness argument:

Is there any reason in the evidence to believe that in fact it was one of those other individuals? No. None of them were here to testify about their involvement. . . .

In order to believe the Defendant, you have to believe that these officers were somehow involved in some conspiracy to frame her. These are officers who never saw her before this particular incident. And you have to believe that three Seattle Police officers got up here and tried to frame somebody. They colluded to do that.

Carter's attorney did not object to this argument at trial and her conviction cannot be reversed on this basis because, although it was improper, we do not find that this statement was so flagrant and ill intentioned that a curative instruction could not have obviated the resultant prejudice. *See State v. Ziegler*, 114 Wn.2d 533, 540, 789 P.2d 79 (1990).

## IV
### DOUBLE JEOPARDY

Carter contends that her double jeopardy rights were violated because the jury was instructed it could convict her of delivery of a controlled substance and of possession with intent to deliver a controlled substance and that it could find her guilty as an accomplice to those acts.[15] She argues that the jury could have convicted her of both counts based on a finding that, before the delivery, she constructively possessed the rock bought by Jackson and was subsequently an accomplice to the completed delivery to Jackson. Thus, she contends she was placed in jeopardy twice for the same conduct.

We reject her argument. Throughout the case, the prosecution clearly distinguished between the two charges. Carter was charged with two separate crimes, and the jury was instructed that she was being tried for two separate crimes. During closing arguments, both the prosecutor and defense counsel argued that Carter was an accomplice to two separate acts which were the basis for the two charges: selling the cocaine to Jackson and possessing the drugs in the vial that Smothers was holding when she was arrested.

This case is different from *State v. Garcia*, 65 Wn. App. 681, 691, 829 P.2d 241, *review denied*, 120 Wn.2d 1003 (1992), in which we held that where there is evidence of two instances from which the jury could have found intent to deliver a controlled substance, one of which violates an appellant's right to be free from double jeopardy, it is reversible error for the court not to instruct the jury "in such a manner as to distinguish the merged charge from the validly charged criminal act". In *Garcia*, the defendant argued that his double jeopardy rights had been violated because there were two instances from which the jury could have found intent to deliver, and the jury's inquiry to the judge during

---

[15]Carter did not object to these instructions at trial. As an alleged manifest error affecting a constitutional right, her Sixth Amendment right to be free from double jeopardy, the issue is properly raised for the first time on appeal. RAP 2.5(a)(3).

deliberation indicated that it was unsure of which act the State was relying upon to establish his intent to deliver. Although the court here did not give an instruction explaining merger, the instructions and the arguments by counsel made it quite clear that the State was relying on Carter's liability as an accomplice in Smothers' possession of the cocaine remaining in the vial after the delivery to Jackson to establish the possession with intent to deliver charge. Thus, there was no violation of Carter's double jeopardy rights.

We affirm.

WEBSTER, C.J., and SCHOLFIELD, J., concur

Review granted at 125 Wn. 2d 1007 (1994).