FILED
COURT OF APPEALS
DIVISION II

2015 AUG -4 AM 9: 59

STATE OF WASHINGTON

BY
DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

# DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON | No. 46139-1-II |
| Respondent, | |
| v. | |
| TRAVIS JEFFREY PARDUE, | UNPUBLISHED OPINION |
| Appellant. | |

SUTTON, J. – Travis J. Pardue appeals his jury trial conviction for one count of residential burglary. He argues that (1) his trial counsel was ineffective for failing to move to exclude a portion of a recorded police interrogation during which Pardue exercised his right to counsel, (2) his trial counsel was ineffective for failing to move to exclude a portion of the recording that disclosed inadmissible prior bad acts evidence and for introducing inadmissible bad acts testimony from two witnesses, and (3) the prosecutor committed misconduct in closing argument by arguing that Pardue had an obligation to present evidence. Because Pardue does not establish ineffective assistance of counsel and has waived his prosecutorial misconduct claim, we affirm.

## FACTS

### I. BACKGROUND

### A. BURGLARY AND INVESTIGATION

Between 4:00 and 4:30 PM on August 8, 2013, William Thomas (Tom) Sweatman heard someone running out of his house when he returned to his Cosmopolis home after work. Tom[1] saw two men running across his deck to a nearby Jeep; they did not stop when Tom yelled at them. Tom followed the Jeep in his truck. RP (Mar. 11, 2014) at 39. As he drove past his father-in-law's nearby home, Tom also noticed that its garage door was open.

During the pursuit, Tom was able to drive up next to the Jeep and see the occupants. In addition, he observed that both the driver and passenger were wearing white gloves, which they eventually threw out of the window along with a purple or blue item.

When Tom stopped following the Jeep, he contacted the police; an officer met him at his home. His master bedroom and a bathroom had been ransacked. Empty drawers from a jewelry box were on the bed. In addition, the garage door and a side door of the father-in-law's house were open and there appeared to be firearms missing from the house.

The investigating officers eventually located the Jeep, which was owned by Deanna Lincoln. Lincoln asserted that she had loaned the Jeep to a man named Rom Drittenbas on August 7. Although he returned the car, the car went missing on the morning of August 8, and

---

[1] Because Tom and his daughter Christi share a last name, we refer to them by their first names to avoid confusion; we intend no disrespect.

No. 46139-1-II

Lincoln reported it stolen.[2] Lincoln also knew Pardue and knew that Pardue and Drittenbas were friends.

The officers also recovered the gloves and a purple Crown Royal bag from the roadway. Pardue's DNA was found on one of the gloves.

After Tom reported the burglary, his daughter Christi Sweatman suggested that Pardue, her former boyfriend, might be involved in the crime. She thought it was more than a coincidence that Pardue had called her at about 11:00 AM on August 8, and told her that he had planned to stop by her house to leave a note for her in her car but did not want to run into her father. Pardue also told her that he and his friend "Rom" were then going to go to Ocean Shores. 1 Verbatim Report of Proceedings (RP) at 149-50. Christi told Pardue that she was out of town with her mother, sister, and grandfather and that her father was not going to be home until later.

Tom eventually identified Pardue in a photo lineup as one of the men involved in the burglary. Tom also later identified Rom in another photomontage.

B. POLICE INTERVIEW

Officers located and arrested Pardue. After an officer advised Pardue of his *Miranda*[3] rights, Pardue agreed to talk to him.

When the officer asked Pardue if he knew anything about a possible burglary, he responded, "I don't ever do any of that stuff man." Clerk's Papers (CP), Ex. 32 at 7. The officer

---

[2] Lincoln later testified that on August 8, she had received a call from Drittenbas who told her that he "was in a high speed chase with the homeowner" and asked her to report that the car had been stolen. 1 Verbatim Report of Proceedings (RP) at 93.

[3] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

3

then asked Pardue about his criminal history and whether it involved narcotics. Pardue responded, "No. I just do like a whole bunch of domestic violence, uh, situations with me and my ex and that's about it. Just No Contact Orders." CP, Ex. 32 at 7. Pardue denied having been involved in any property crimes or thefts. When the officer asked Pardue where he was on August 8, Pardue responded, "I'm pretty sure I was hanging out with my . . . friend Nessa. That's who I've been pretty much hanging out with." CP, Ex. 32 at 8.

Pardue denied having talked to Christi on the day of the robbery, but he later admitted to a phone conversation that was very similar to the one Christi had described as having occurred that day. Pardue also asserted that Christi never said anything to him about a burglary. He then commented:

> She's I mean she has been acting really funny every time I talk to her like you know blah, blah this and this and that and the other thing. I'm just like okay. I kind of heard through the grapevine that something like that happened but I never thought that she would point the finger at me for something like that.

CP, Ex. 32 at 10. When the officer asked Pardue why Christi would want to do something like that to him, Pardue responded:

> Yeah. Probably. Like me and her were really close and everything and then we kind of did drugs together and like that and then she started taking it to[o] far [inaudible] and I didn't want to contribute to her habit anymore and keep getting her strung out and she lost her job and everything and then she would fuckin call my hookups and have people deliver drugs out to her and shit like that and . . . .

CP, Ex. 32 at 10.

4

The following conversation then ensued:

[OFFICER] Okay. Has she ever done anything that would lead you to believe that this is fake or that she made it up or that she may have done some of this stuff to get dope or anything like that? I mean, I you (sic) didn't know for a long, long time but do you know her to be doing anything to be involved in anything like that?

PARDUE Before I make a statement like that *I probably should have a lawyer present because I don't want I am not the type of person that will get anybody in trouble* for anything or myself in

[OFFICER] You don't got to talk about her. I don't care. I just didn't want [inaudible].

PARDUE She, I've known her to take things from her grandparent's house before but and

[OFFICER] I mean she's not going to get in trouble for it for past stuff because I am not investigating past stuff but I just want I am more worried about is not worried about what I am more trying to figure out because like I said this is something that I am trying to piece together now.

CP, Ex. 32 at 11 (emphasis added). The officer and Pardue then talked about whether Christi had stolen things from her parent's and grandparent's homes.

When the officer told Pardue that Tom had identified Pardue as one of the burglars, Pardue denied having been involved, stating he was "never even there." CP, Ex. 32 at 13. Pardue also commented that Christi's family blamed him for getting their daughter on drugs, so they might want to implicate him in the burglary.

Pardue admitted that he knew Lincoln and had been in her car "a couple of times." CP, Ex 32 at 5. When the officer told Pardue that it was likely the Cosmopolis police would charge him with burglary and possession of a stolen vehicle and that they had found gloves that may have his fingerprints on them, Pardue stated that there were gloves in Lincoln's car with his prints on them because he used these gloves while in the car injecting drugs.

## II. PROCEDURE

The State charged Pardue with two counts of residential burglary. Before trial, defense counsel agreed to an order declaring Pardue's statements during the police interview were voluntary and knowing and, therefore, admissible under CrR 3.5. The trial court played the entire interview for the jury.[4]

The State also presented testimony from the investigating officers, some forensic officers, Tom, Christi, and Lincoln. They testified to the facts as described above.

In addition, during cross examination, defense counsel questioned Christi about why she had implicated Pardue in the burglary:

Q [DEFENSE COUNSEL]. And do you remember . . . making a statement to the cops . . . about the incident?

A [CHRISTI]. I do.

Q. Okay. And do you remember that you made a statement implicating [Pardue] to this crime?

A. Yes.

Q. Now, can you explain why you would make that leap—

A. That leap?

Q. Yeah. Like the conversation in the morning to him committing a burglary at your house, why would you make that . . . assumption?

A. That leap? Because of prior history. He's an addict and he was getting further into his addiction and *he has taken money from me before*. And so—I mean I guess it could be a coincidence, but getting a phone call saying you want to leave a note and then there's no note there and then someone breaks into our house when we're gone.

---

[4] After the jury heard the recording, defense counsel objected and asked the trial court to exclude the portion of the recording following Pardue's reference to counsel because the interview should have been terminated at that point. Noting the prior "stipulation," the trial court declined to revisit the admissibility of the recorded interview. 1 RP at 170-71. Defense counsel did not argue that the reference to counsel was not itself admissible.

Q.      Okay.  So you're—you're saying that—you're speculating that it's Travis? You don't—

A.      Yeah.

Q.      —have definitive—

A.      I was not there, no I was not there.  I did not see . . . him doing it.

1 RP at 156-57 (emphasis added).

Tom also identified Pardue as one of the men he saw in the Jeep.  And Lincoln also testified Pardue had never, to her knowledge, been in her car.

Pardue presented an alibi defense through three witnesses: Pardue's daughters' maternal grandmother Christine Krenik, Krenik's mother Eleanor Selness, and Pardue's former girlfriend Janessa Sparks.  These witnesses testified that on August 8, Pardue was with Krenik and Selness at their house in Olympia visiting his daughters.  At 3:30 PM, Krenik and Selness left the house to attend a birthday party for one of Pardue's daughters, but Pardue remained behind.  When defense counsel asked Krenik why Pardue was at her house, she responded,

> He was visiting his daughters.  It was—we were— can I say this?  We were having his daughter's birthday that day so he came over to see them before the party because he couldn't—he can't go out to my brother's because him and my sister don't get along and *there's a restraining order with my daughter*.

2 RP at 188 (emphasis added).

Selness testified that there were several other people at the child's birthday party and that there were no invitations mailed because guests were notified by word of mouth.  On redirect, defense counsel asked Selness if she could explain why Pardue remained behind when the rest of them left to attend the birthday party.  She responded, "He had a restraining order against him to not be . . . near the children's mother." 2 RP at 211.

7

No. 46139-1-II

Sparks testified that Pardue was with her the morning of August 8, and that he had called Christi on her phone. Sparks also testified that she had later picked Pardue up at Krenik and Selness's home at about 4:30 PM, and she (Sparks) and Pardue spent the rest of the evening together.

In closing argument, the prosecutor argued:

> Now, you heard from . . . the grandmother and the great grandmother of his children and you heard from his girlfriend. Okay. And here they are—I don't— it's unfortunate for them, because six months later they're being asked to reconstruct something that happened and [to] be honest. Okay. And the child's birthday was the 27th of July but, oh, gee, it was on this Thursday, August the 8th, I know that.

> *Now. I—I don't see a party invitation, I didn't see a calendar where a date was written, and I didn't see a—Pattie or whoever else who was at the party or—if they're certain that it was the 8th and they're certain that they left at 3:30—around 3:30.* Well, we all have been to Olympia you now the distance and the time. We know that Mr. Pardue got there you know.

2 RP at 241 (emphasis added). Pardue did not object to this argument.

The jury found Pardue guilty of the residential burglary of Tom's residence.[5] Pardue appeals his conviction.

## ANALYSIS

Pardue argues that he received ineffective assistance of counsel on various grounds and that the prosecutor engaged in prosecutorial misconduct in closing argument. These arguments fail.

---

[5] The jury found him not guilty of the other residential burglary charge.

## I. INEFFECTIVE ASSISTANCE OF COUNSEL CLAIMS

### A. STANDARD OF REVIEW

To succeed on his ineffective assistance of counsel claim, Pardue must establish that defense counsel's conduct was both deficient and prejudicial. *State v. Grier*, 171 Wn.2d 17, 33, 246 P.3d 1260 (2011). Counsel's representation is deficient if it falls below an objective standard of reasonableness based on consideration of all the circumstances. *State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995). Pardue must overcome a strong presumption that counsel's performance was reasonable, and counsel's tactical decisions cannot form the basis for a claim of ineffective assistance of counsel. *Grier*, 171 Wn.2d at 33; *McFarland*, 127 Wn.2d at 336. To establish prejudice, Pardue must show that but for defense counsel's deficient performance, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 694, 104 S. Ct. 2052, 80 L.Ed.2d 674 (1984).

### B. FAILING TO OBJECT TO EVIDENCE DISCLOSING EXERCISE OF RIGHT TO COUNSEL

Pardue first argues that defense counsel provided ineffective assistance by stipulating to the admission of the recorded police interview without objecting to the portion of the interview in which Pardue refers to counsel. Pardue contends that the admission of this evidence could have allowed the jury to "improperly infer guilt based on the exercise of a constitutional right." Reply Br. at 2. We disagree.

Taken in context, Pardue's reference to counsel related to his willingness to comment on Christi's potential involvement, not his own:

> [OFFICER]   Okay. Has she ever done anything that would lead you to believe that this is fake or that she made it up or that she may have done some of this stuff to get dope or anything like that? I mean, I you (sic) didn't know for a long, long time but do you know her to be doing anything to be involved in anything like that?
>
> PARDUE   Before I make a statement like that *I probably should have a lawyer present because I don't want I am not the type of person that will get anybody in trouble for anything* or myself in . . .

CP, Ex. 32 at 11 (emphasis added).

Commenting on a defendant's exercise of his right to counsel can be improper because it can infer a defendant believes himself to be guilty. *United States ex rel. Macon v. Yeager*, 476 F.2d 613, 616-17 (3rd Cir. 1973). But Pardue's reference to counsel was intended to protect another person, not himself, so there was no reason for a jury to potentially infer Pardue's guilt. Thus, even if defense counsel had raised this argument, it is unlikely the trial court would have granted a motion to exclude this portion of the interview. Accordingly, Pardue fails to show that the result of the proceeding would have been different, and this argument fails.

### C. Failing To Object To or Eliciting Propensity Evidence

Pardue next argues that defense counsel provided ineffective assistance by stipulating to the admission of the police interview without objecting to the portion of the interview in which Pardue refers to his domestic violence convictions and by eliciting other propensity evidence when questioning Selness and Christi. Specifically, Pardue refers to (1) the portion of his police interview in which he admits to having prior domestic violence convictions and a no contact order, (2) Selness's testimony that Pardue was subject to a restraining order, and (3) Christi's testimony that Pardue had "taken" money from her in the past. 1 RP at 156.

## 1. POLICE INTERVIEW

During the police interview, Pardue adamantly denied committing any type of property crimes, but he admitted that he had a history of domestic violence with his "ex" and no contact order violations. CP, Ex. 32 at 7. Although the information about the domestic violence and no contact orders was arguably not relevant to this crime and it is likely that the trial court would have granted a motion to exclude this portion of the interview, Pardue does not show that a failure to object to this part of the interview was not a reasonable defense tactic. That Pardue readily admitted he had committed some crimes while simultaneously denying any involvement in any property crimes could suggest that Pardue was not being evasive and was telling the truth during the interview. Defense counsel could have reasonably chosen not to object to this portion of the interview to bolster Pardue's credibility. Because this could have been a reasonable tactical choice, Pardue does not establish ineffective assistance of counsel on this ground.

## 2. SELNESS'S TESTIMONY

Pardue next argues that defense counsel provided ineffective assistance by soliciting Selness's testimony that Pardue was subject to a restraining order. Selness commented on the restraining order when defense counsel asked her why Pardue did not accompany the rest of the family to his daughter's birthday party. Defense counsel could have reasonably solicited this testimony to explain why Pardue was not with the rest of the family and missed an important event in his daughter's life. Thus, this could have been a reasonable tactical decision.

Additionally, even if defense counsel did not intentionally solicit this testimony, the jury had already heard Pardue admit to being subject to a restraining or no contact order during the police interview and Krenik had also testified about a restraining order. Thus, this testimony was

11

merely cumulative and defense counsel could have chosen not to object in order to avoid drawing additional attention to the testimony. Furthermore, because the jury had already heard this information from two other sources, any failure to object to Selness's testimony was not prejudicial. Accordingly, Pardue does not show ineffective assistance of counsel on this ground.

### 3. CHRISTI'S TESTIMONY

Pardue next challenges the portion of Christi's testimony in which she states that Pardue had "taken money from [her] before." 1 RP at 156. Read in context, it appears defense counsel was attempting to elicit testimony to show Christi's suspicion that Pardue was involved in the burglary was mere speculation. Defense counsel's attempt to demonstrate that Christi's belief that Pardue was involved in the burglary was mere conjecture was not an unreasonable tactic. And it does not appear that defense counsel's questions were intended to prompt Christi to testify that Pardue had previously taken money from her.[6] In fact, there is nothing in the record suggesting that defense counsel was aware of this fact before questioning Christi. Furthermore, it would have been a reasonable tactical decision for defense counsel to not move to strike this portion of Christi's response in order to avoid drawing attention to this statement. *State v. Gladden*, 116 Wn. App. 561, 568, 66 P.3d 1095 (2003) (failure to object could be described as legitimate trial tactic because counsel wanted to avoid drawing attention to the remark). Accordingly, Pardue fails to show ineffective assistance of counsel on this ground.

---

[6] Pardue does not argue that defense counsel should not have elicited Christi's testimony about Pardue's drug addiction.

## II. Prosecutorial Misconduct Claim

Finally, Pardue argues that the prosecutor engaged in misconduct during closing argument by violating the missing witness doctrine and improperly suggesting that Pardue had the burden to present evidence. Because Pardue fails to show that any alleged improper argument could not have been cured with a proper instruction, he has waived this argument.

"A defendant arguing that prosecutorial misconduct violated his or her right to a fair trial has the burden of showing the prosecutor's conduct was both improper and prejudicial in the context of the entire trial." *State v. Walker*, 182 Wn.2d 463, 477, 341 P.3d 976 (2015) (citing *In re Pers. Restraint of Glasmann*, 175 Wn.2d 696, 704, 286 P.3d 673 (2012)). A prosecutor can commit misconduct by violating the missing witness doctrine or commenting on the lack of evidence. *State v. Cheatam*, 150 Wn.2d 626, 843-44, 81 P.3d 830 (2003); *State v. Carter*, 74 Wn. App. 320, 332, 875 P.2d 1 (1994), *aff'd*, 127 Wn.2d 836, 904 P.2d 290 (1995).

But when an appellant raises a prosecutorial misconduct issue for the first time on appeal, he must also show "that the misconduct was so flagrant and ill-intentioned that an instruction would not have cured the prejudice." *Glasmann*, 175 Wn.2d at 704; *see also Carter*, 74 Wn. App. at 332 n.14. In such cases, "[w]e do not focus on the prosecutor's subjective intent in committing misconduct, but instead on whether the defendant received a fair trial in light of the prejudice caused by the violation of existing prosecutorial standards *and whether that prejudice could have been cured with a timely objection*." *Walker*, 182 Wn.2d at 488 (citing *State v. Emery*, 174 Wn.2d 741, 762, 278 P.3d 653 (2012)) (emphasis added).

13

Pardue argues that the prosecutor engaged in misconduct when he argued that Pardue had not presented potential evidence related to his daughter's birthday party, namely testimony from any party guest or physical evidence of the party that could have corroborated his alibi defense. He further argues that this improper argument was prejudicial because his entire defense rested on his alibi defense, and he asserts, without discussion, that the argument was flagrant and ill intentioned. But Pardue fails to specifically address whether any potential prejudice caused by this alleged error could have been cured by a timely objection.

Although Pardue's alibi was key to his defense, he does not show that the trial court could not have neutralized any of this potentially improper argument with a curative instruction advising the jury that the burden of proof was on the State and that Pardue was not required to present any evidence.[7] Because Pardue did not object to the prosecutor's argument, he has waived his challenge to the prosecutor's argument.

---

[7] We also note that the trial court had already instructed the jury that the State had the burden of proof; we presume that the jury follows the instructions. CP at 15-16 (Jury Instruction 3); *State v. Johnson*, 124 Wn.2d 57, 77, 873 P.2d 514 (1994).

No. 46139-1-II

Pardue fails to establish ineffective assistance of counsel and he has waived his prosecutorial misconduct claim. Thus, we affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Sutton, J.

SUTTON, J.

We concur:

Johanson, C.J.

JOHANSON, C.J.

Bjorgen, J.

BJORGEN, A.C.J.