219 P.3d 958 (2009)
STATE of Washington, Respondent,
v.
Gerald William JOHNSON, Appellant.
No. 37211-8-II.
Court of Appeals of Washington, Division 2.
November 9, 2009.
*959 John A. Hays, Attorney at Law, Longview, WA, for Appellant.
Michael C. Kinnie, Attorney at Law, Vancouver, WA, for Respondent.
PENOYAR, J.
¶ 1 Gerald Johnson appeals his second degree child molestation conviction, claiming that (1) the trial court allowed impermissible opinion testimony from a lay witness; (2) counsel failed to object to the impermissible opinion testimony, depriving him of effective assistance; (3) the trial court's instruction on corroborative evidence was an impermissible comment on the evidence; (4) and the trial court improperly imposed an exceptional sentence. We reverse because the trial court allowed impermissible and highly prejudicial lay witness testimony.

FACTS
¶ 2 In 1999, Mary Pfeifle and her family were living in Vancouver, Washington, in the Ironwood Apartments when Stacy and Gerald Johnson moved into an apartment directly across from theirs. The families became close friends and spent time together in town, on day trips up the Washougal River, and on annual extended camping trips. Pfeifle had a husband, Greg Pfeifle, and five children, including TW (born May 1, 1987) and AC (born November 21, 1991).
¶ 3 In November 2004, at Mary's birthday party, she noticed that her oldest daughter, TW, then 17 years old, had a $100 bill in her handbag. TW explained that Johnson had given it to her so she could buy a cell phone. Mary testified that she called Johnson to talk about the money while giving TW a ride. Johnson confessed that he was in love with TW, that every time he looked into TW's eyes, he melted, and that he wanted to marry her when she turned 18.
¶ 4 TW testified that she first kissed Johnson when she was in the 7th grade and that either on Christmas Eve or New Year's Eve that holiday season, he put his hand between her thighs, rubbing her upper thighs over her clothing. She also recalled that later, after her family moved to their Snowberry Loop home, she and Johnson began touching each other under their clothing. He would rub her thighs, buttocks, and breasts. She described one camping trip in 2002, when she was 15 years old, where he had intercourse with her in her tent late at night and, after that, they regularly engaged in sexual intercourse until her mother learned about the relationship in November 2004. She explained that when she lived at Snowberry, she would see Johnson every day and they would engage in oral sex, masturbation, and vaginal sex at his grandmother's home, in his *960 van, and "everywhere." Report of Proceedings (RP) at 216.
¶ 5 After learning about TW's sexual relationship with Johnson, Mary asked AC if anything had happened to her. AC described two incidents. In the first, Johnson allegedly asked AC for a good night kiss as she was going to bed, and Johnson, who was lying on the bed, put his hand between her thighs, spreading them apart, and placed his hand on her pelvic area for 30 to 35 seconds. In the second incident, she alleged that she was dozing off during a movie she and Johnson were watching on a backyard campout and woke up to find his arm around her and his hand touching her breast.
¶ 6 The State charged Johnson with one count of second degree child molestation against TW between May 1, 1999, and April 30, 2001.[1] It also charged Johnson with first degree child molestation against AC between November 1, 2001 and December 31, 2002.[2] The trial court dismissed a count of communication with a minor for immoral purposes against TW because the statute of limitation had expired.
¶ 7 After the trial had begun, the State learned that Stacy Johnson had stayed with the Pfeifles after she learned about the allegations against Johnson. During that stay, Stacy allegedly had a heated confrontation with TW and TW insisted that she had had a sexual relationship with Johnson, describing a purple spot or mole on Johnson's penis, and demonstrating the unique way that she said Johnson would masturbate. The trial court allowed this testimony as well as testimony that in reaction to TW's statements during the confrontation, Stacy Johnson took an overdose of medication and was hospitalized as a result.
¶ 8 Stacy Johnson related a different view of this encounter. She testified that she was very distraught at the time and had just had a confrontation with Pfeifle's brother's girlfriend who had accused Stacy of trying to steal her boyfriend. She denied that she and TW talked about Johnson's penis or his masturbation technique. She said the discussion was about TW loving Johnson and wanting to marry him.
¶ 9 Johnson denied the allegations, denied that he ever gave the girls rides, and denied that he ever said that he wanted to marry TW. He explained that he gave $100 to TW to buy a cell phone but that he expected her to return the $70 she did not need. He helped her, Johnson explained, because she was looking for work and wanted a cell phone number to use on her job applications and she was not on speaking terms with her stepfather, Greg Pfeifle.
¶ 10 Over the defense's objection that a proposed corroboration instruction amounted to a comment on the evidence, the trial court gave the following instruction:
In order to convict a person of a sexual offense against a child, it shall not be necessary that the testimony of the alleged victim be corroborated.
Clerk's Papers (CP) at 107.
¶ 11 The jury acquitted Johnson of the allegation involving AC but convicted him of the allegation involving TW. The trial court imposed a 60-month exceptional sentence.

ANALYSIS

I. Testimony about Stacy Johnson's confrontation with TW
¶ 12 Johnson first argues that the trial court erred in admitting testimony about a confrontation between Stacy and TW because this testimony amounted to improper opinion testimony on his guilt. Admitting this evidence, he argues, served only one purpose: "to convey to the jury that the defendant's wife believed [TW] was telling the truth and that the defendant was guilty. Why else would she leave her husband and then attempt to commit suicide when [TW] gave her evidence that proved her husband was guilty?" Appellant's Br. at 20. He argues that the State exacerbated this error by questioning TW, Mary, and Greg Pfeifle about Stacy's attempted suicide and then emphasizing during closing arguments that this *961 evidence showed that TW's allegations were well-founded. We agree.
¶ 13 On June 29, 2007, during trial, the attorneys first became aware that within a week of TW's allegations against Johnson, TW had a confrontation with Stacy at the Pfeifle home. In response to the State's efforts to admit this evidence, defense counsel explained:
I was wondering what I was going to say. I  I think mostly what we talked about this afternoon is really not a whole lot to do with the case, it's sort of a sideshow.
When we originally went out there I thought the issue was whether or not Stacy's going to say that she said there was a penis mole or not, but she's saying there's not.
However, I can't say the State cannot put on this evidence, maybe it does have some tangential relevancy. So that's all I can say. We were out there interviewing the folks.
RP at 351.
¶ 14 As we discuss below, we review for a manifest constitutional error because counsel did not raise a proper objection below. RAP 2.5(a)(3). Generally, no witness, lay or expert, may give an opinion, directly or inferentially, on the defendant's innocence or guilt. State v. Black, 109 Wash.2d 336, 348, 745 P.2d 12 (1987). Such opinions are unfairly prejudicial because they invade the fact finder's exclusive province. Black, 109 Wash.2d at 348, 745 P.2d 12; see also State v. Kirkman, 159 Wash.2d 918, 927-28, 155 P.3d 125 (2007) (opinion on defendant's guilt violates article I, section 21 of the Washington Constitution). However, if the testimony does not directly comment on the defendant's guilt or veracity, helps the jury, and is based on inferences from the evidence, it is not improper opinion testimony. See State v. Farr-Lenzini, 93 Wash.App. 453, 465, 970 P.2d 313 (1999) (improper opinion on defendant's guilt invades jury's province); City of Seattle v. Heatley, 70 Wash.App. 573, 579, 854 P.2d 658 (1993) (officer could give his opinion that defendant was intoxicated because it was based on the defendant's physical characteristics); State v. Alexander, 64 Wash.App. 147, 154, 822 P.2d 1250 (1992) (by stating his belief that the child was not lying about sexual abuse, the expert "effectively testified" that the defendant was guilty as charged); State v. Carlin, 40 Wash.App. 698, 700, 700 P.2d 323 (1985) (the police officer testified that the tracking dog followed the defendant's "fresh guilt scent"); see also Black, 109 Wash.2d at 349, 745 P.2d 12 (in a rape case, expert testimony that the victim suffered from rape trauma syndrome constituted "in essence" a statement that the defendant was guilty where defense was consent).
¶ 15 "Whether testimony constitutes an impermissible opinion about the defendant's guilt depends on the circumstances of the case, including (1) the type of witness involved, (2) the specific nature of the testimony, (3) the nature of the charges, (4) the type of defense, and (5) the other evidence before the trier of fact." State v. Hudson, 150 Wash.App. 646, 653, 208 P.3d 1236 (2009) (citing State v. Montgomery, 163 Wash.2d 577, 591, 183 P.3d 267 (2008)) (quoting State v. Demery, 144 Wash.2d 753, 759, 30 P.3d 1278 (2001)).
¶ 16 Here we have out of court statements attributed to the victim's spouse indicating her belief in the truthfulness of the victim's allegations. These statements were not introduced initially because the State carefully skirted the content of this meeting between TW and Stacy. In its case in chief, Mary and Greg Pfeifle testified that there was a confrontation but they did not mention the contents of those discussions. TW testified that she had described a lesion on the defendant's penis and how he masturbated. She did not testify about Stacy's immediate reaction, but she did relate that several hours after the discussion, Stacy tried to commit suicide and Greg took her to the emergency room.
¶ 17 Stacy testified on Johnson's behalf. In addition to denying that Johnson was ever alone with TW and working long hours during that time, Stacy denied that Johnson had a lesion on his penis and denied that she had ever discussed it with TW. During the State's cross examination, Stacy admitted *962 that she had a confrontation with TW, explained that she was distraught in part because TW told her she loved her husband and wanted to marry him, admitted that she tried to commit suicide, denied that the main reason for doing so was because of TW's allegations, and again denied that her husband had a lesion on his penis.
¶ 18 Mary Pfeifle testified in the State's rebuttal after the trial court instructed the jury that it could only consider her testimony for purposes of determining credibility. Instead of focusing the witness on evidence that might bear on credibility, the State seemingly asked Mary Pfeifle what she saw and heard between TW and Stacy that night. She responded:
We were standing around in the garage talking, and there was a confrontation between [TW] and Stacy, and Stacy wasn't completely believing what was being said, and she told my daughter that if it was true to describe something that only someone that had been with [Johnson] would know.
And she described like a skin-tag, mole-type thing on his penis, and how he masturbates.
RP at 544-45.
The State then asked how Stacy reacted, and Mary explained:
She freaked out. She became hysterical. She said it was true and the rest of the night became a nightmare, she ended up in the hos
RP at 545. Mary then explained that TW had described to Stacy how Johnson masturbates and that Stacy "acknowledged that she had to have been with him in order to know these things." RP at 546. Greg Pfeifle then testified that he was also present during this discussion and Stacy's reaction to TW's description was "Oh, my God, it's true," and then she started crying. RP at 549.
¶ 19 Finally, the State recalled TW. She explained that Stacy had asked her to say something that only someone who had seen Johnson's penis would know and that she had then described his lesion. TW then explained, "And she started freakin' out, told me that I was right, she believed me, she was sorry she didn't believe me." RP at 552. When TW then described to Stacy how Johnson masturbated, she said that Stacy "started crying and flipped out even more and told me I was right." RP at 552. She said that Stacy then apologized for not believing her, that she was sorry this happened, and that she would not have to deal with her anymore.
¶ 20 The State argues that the trial court properly instructed the jury that the various versions of Stacy's reaction to what TW told her were only admitted to assist the jury in determining credibility. The first problem with this is that Stacy's opinion itself is entirely collateral. Thus, impeaching Stacy or any other witness on how Stacy reacted is impeachment on a collateral matter. See State v. Oswalt, 62 Wash.2d 118, 120-21, 381 P.2d 617 (1963) (a witness cannot be impeached on matters collateral to the principal issues being tried to avoid undue confusion of issues and to prevent unfair advantage over a witness unprepared to answer concerning matters unrelated or remote to the issues at hand) (citing State v. Fairfax, 42 Wash.2d 777, 779-80, 258 P.2d 1212 (1953); 3 Wigmore on Evidence (3d ed.) § 1002, p. 656). Secondly, this testimony sheds little or no light on any witness's credibility or on evidence properly before the jury and really tells us only what Stacy believed  and the other witnesses thought Stacy believed  about TW's accusations. Finally, the State's witnesses' versions of Stacy's reaction were highly prejudicial: Johnson's own wife believed the accusations. This evidence was clearly more prejudicial than probative under ER 403. Furthermore, counsel's failure to object does not bar our review on appeal. This was a manifest constitutional error and Johnson can raise it for the first time on appeal. See State v. Montgomery, 163 Wash.2d 577, 595, 183 P.3d 267 (2008) (defendant may challenge admission of lay testimony on appeal for first time if he can show a manifest error that causes actual prejudice or practical and identifiable consequences) (citing State v. Kirkman, 159 Wash.2d at 934-35, 155 P.3d 125 and RAP 2.5(a)(3)).
¶ 21 First, this claim of error is constitutional because it implicates Johnson's right to a fair trial under article 1, section 21 of the *963 Washington State Constitution and the Sixth Amendment to the United States Constitution. These provisions guarantee a criminal defendant the right to a fair trial and an impartial jury. Lay witness opinion testimony about the defendant's guilt invades this right. Carlin, 40 Wash.App. at 701, 700 P.2d 323. Second, this error is manifest because it actually affected Johnson's right to a fair trial. The jury should not have heard collateral testimony that Johnson's wife believed TW's allegations. This inadmissible testimony served no purpose except to prejudice the jury. This manifest error denied Johnson his constitutional right to a fair trial. See Montgomery, 163 Wash.2d at 596 n. 9, 183 P.3d 267 ("We note that if there were evidence that these improper opinions influenced the jury's verdict, we would not hesitate to find actual prejudice and manifest constitutional error regardless of the failure to object or the likelihood that an objection would have been sustained.").

II. Instruction 13: Comment on the Evidence.
¶ 22 Johnson argued below and now on appeal that the trial court's instruction 13 constituted a comment on the evidence. He argues first that the instruction is an incorrect statement of the law and second that it gave undue emphasis and importance to one witness's testimony. As this issue could arise again at trial, we address it as well. Cox v. Gen. Motors Corp., 64 Wash.App. 823, 829, 827 P.2d 1052 (1992).
¶ 23 We review whether the instruction was legally correct de novo. State v. Becklin, 163 Wash.2d 519, 525, 182 P.3d 944 (2008). Article 4, section 16 of the Washington Constitution provides that "`[j]udges shall not charge juries with respect to matters of fact, nor comment thereon, but shall declare the law.' A statement by the court constitutes a comment on the evidence if the court's attitude toward the merits of the case or the court's evaluation relative to the disputed issue is inferable from the statement." State v. Lane, 125 Wash.2d 825, 838, 889 P.2d 929 (1995) (quoting Wash. Const. art. IV, § 16). However, the comment violates the constitution only if those attitudes are "reasonably inferable from the nature or manner of the court's statements." State v. Elmore, 139 Wash.2d 250, 276, 985 P.2d 289 (1999) (quoting State v. Carothers, 84 Wash.2d 256, 267, 525 P.2d 731 (1974)). A jury instruction is not an impermissible comment on the evidence when sufficient evidence supports it and the instruction is an accurate statement of the law. State v. Hughes, 106 Wash.2d 176, 193, 721 P.2d 902 (1986).
¶ 24 The State responds that the given instruction is a proper statement of the law as it follows RCW 9A.44.020(1), which provides:
(1) In order to convict a person of any crime defined in this chapter it shall not be necessary that the testimony of the alleged victim be corroborated.
Clearly, the trial court's instruction is nearly identical to this statute:
In order to convict a person of a sexual offense against a child, it shall not be necessary that the testimony of the alleged victim be corroborated.
CP at 107. This instruction is similar to one we reluctantly approved in State v. Zimmerman, 130 Wash.App. 170, 181, 121 P.3d 1216 (2005), which discussed similar instructions given in State v. Clayton, 32 Wash.2d 571, 572, 202 P.2d 922 (1949), and State v. Malone, 20 Wash.App. 712, 714, 582 P.2d 883 (1978).
¶ 25 Johnson points to language in Clayton that qualified the above instruction to specifically tell the jury that, while corroboration is not required, credibility questions remained entirely for the jury.[3] Johnson argues that without the additional language, the instruction *964 here puts the complaining witness's testimony in a favorable light, at least compared to the other witnesses. We note that in Clayton, the Supreme Court case on which Zimmerman relies, the instruction included additional language such as Johnson now advances. Zimmerman approved an instruction identical to that given here, but Zimmerman did not argue on appeal that the additional language was required. Thus, the Zimmerman court was not asked to consider whether such additional language must be given as part of the collaboration instruction.
¶ 26 We see no clear pronouncement from our Supreme Court on whether the additional language is necessary to prevent an impermissible comment on the evidence under article 4, section 16, and we hold that the trial court's corroboration instruction was not an erroneous statement of the law. When giving this instruction, however, trial courts should consider instructing the jury that it is to decide all questions of witness credibility as part of the instruction.[4] Without this specific inclusion, the instruction stating that no corroboration is required may be an impermissible comment on the alleged victim's credibility.
¶ 27 We reverse.
WE CONCUR: VAN DEREN, C.J., and BRIDGEWATER, J.
NOTES
[1] A violation of RCW 9A.44.086.
[2] A violation of RCW 9A.44.083.
[3] The Clayton instruction provided:

You are instructed that it is the law of this State that a person charged with attempting to carnally know a female child under the age of eighteen years may be convicted upon the uncorroborated testimony of the prosecutrix alone. That is, the question is distinctly one for the jury, and if you believe from the evidence and are satisfied beyond a reasonable doubt as to the guilt of the defendant, you will return a verdict of guilty, notwithstanding that there be no direct corroboration of her testimony as to the commission of the act.
Clayton, 32 Wash.2d at 572, 202 P.2d 922.
[4] In reality, the trial court would be reminding the jury of its authority and responsibility to decide issues of credibility as it normally instructs elsewhere in the usual instructions.