# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 58288-1-II |
| Respondent, | |
| v. | |
| DERANTE RASHAWN COOK, | UNPUBLISHED OPINION |
| Appellant. | |

GLASGOW, J.—After entering JK's apartment at night through an unlocked door, Cook pulled JK from her bed, choked her with a blanket or pillow, and raped her. JK was unable to see Cook. Several years later, after DNA evidence identified Cook, the State charged him with first degree rape and first degree burglary.

At trial, JK testified about the incident. Cook testified that JK had let him into her apartment and consented to intercourse with him. The jury found Cook guilty as charged.

Cook appeals, arguing that insufficient evidence supports his convictions, that the use of the terms "rape kit" and "sexual assault kit" by the prosecutors[1] and State witnesses violated his right to a fair trial, and that he received ineffective assistance of counsel.

We affirm.

---

[1] Two prosecutors represented the State at trial.

FACTS

I. BACKGROUND

In 2018, JK lived in a ground floor apartment with her husband, her two-year-old son, and her seven-year-old daughter. One night, while JK's husband was away, a stranger entered her apartment through an unlocked patio door and raped her while her son slept nearby. After the stranger left, JK called her husband and then reported the incident to law enforcement. A responding law enforcement officer recommended that JK go to a hospital for a sexual assault exam.

At the hospital, a sexual assault nurse examiner took swabs from JK's body. A forensic scientist used one of the swabs to generate a DNA profile of the perpetrator and entered it into the Combined DNA Index System (CODIS), the combined state and federal police DNA databases.

Initially, CODIS did not match the perpetrator's DNA profile to any individual. But almost three years after the incident, CODIS matched the profile to Derante Cook. The State charged Cook with first degree rape and first degree burglary with sexual motivation.

II. TRIAL

A.     Use of the Terms "Rape Kit" and "Sexual Assault Kit"

During voir dire, the State asked a prospective juror what evidence they might want to see in a sexual assault case. The prospective juror said they would want to see a "rape kit." Verbatim Rep. of Proc. (VRP) at 517. The State then asked all the prospective jurors whether they would "expect to see a rape kit." VRP at 518. A second prospective juror said, "I'm not sure what a rape kit is," and a third prospective juror briefly explained before the State moved on to a different subject. *Id.*

Throughout the trial, both the prosecutors and the State's witnesses used the terms "rape kit" and "sexual assault kit" when referring to the kit used to collect biological evidence from JK.[2] For example, during the State's opening, one of the prosecutors said JK had a "rape kit done right after the incident." VRP at 589. Additionally, a forensic scientist testified that she "[examined] a sexual assault kit" while working on this case. VRP at 666. Defense counsel did not object to the use of these terms. However, defense counsel successfully objected at least twice when the State referred to the incident as a sexual assault.

B.      State Witnesses

1.      Testimony about the assault

JK testified for the State. She said that in 2018, she was 5'2" tall and weighed about 110 pounds. On the night of the incident, she left her apartment's patio door unlocked. She put her daughter to bed in her daughter's bedroom, put her son to bed in her own bedroom, and went to sleep.

Later that night, the light in the bathroom attached to JK's bedroom came on and off. Thinking her husband had returned, JK intended to fall back asleep, but she "felt something underneath [her] feet." VRP at 619. Cook, who was hiding under her bed, pulled her to the floor. He pinned her down and choked her with a pillow or blanket.

JK said she had a difficult time breathing, so she turned her face to "have some type of airway." VRP at 622. Defense counsel cross-examined JK about her account of being choked: "I

---

[2] In his opening brief, Cook notes that the prosecutors and State witnesses used the terms "rape kit" and "sexual assault kit" more than 40 times, citing VRP at 517-19, 587-89, 659-60, 666-68, 682, 689, 728, 755, 780-81, 836, 866, 1008-09, 1014, 1041.

think you had told [a detective] this went on for 5 or 10 minutes? You're not sure?" VRP at 880.

JK replied, "That was per my recollection, but I have no way to prove it." *Id.*

JK testified that after she turned her face so she could breathe, Cook covered her mouth with his hand. JK said she noticed a "unique type of lotion or perfume smell that's usually used by [B]lack people." VRP at 622. Defense counsel cross-examined JK about this statement:

Q: And last week you testified that you suspected that this man was African-American because of the cologne that he wore?

A: It wasn't any particular cologne smell. I was referring to the smell from the body itself. It was not necessarily from the body either. It was not from a body lotion or a cologne, but kind of a smell there.

Q: So the man smelled in a way that made you think that he was [B]lack?

A: Yes.

VRP at 887-88.

JK testified that while Cook pinned her down, she said, "'Please don't kill me,'" and Cook reacted by choking her harder. VRP at 623. He removed her pants and underwear and dragged her to the bathroom, where he touched her vagina. Cook then dragged her back to the bedroom, put her on the floor, and choked her again with a pillow or blanket. JK said, "[H]e was choking harder and harder, so I thought I was going to be killed if I resist more . . . I was afraid for my son who was sleeping in the bed . . . so I gave up resisting." VRP at 635. Cook then had sexual intercourse with JK for about 30 seconds before he suddenly stopped, rolled JK toward a closet, and threw her in.

During the incident, JK was not wearing her glasses, and the only light came from a nightlight in the bathroom. JK could not see what Cook looked like. She testified that she did not

leave the patio door unlocked for Cook, invite Cook into her home, or consent to having sex with him.

>    2.    Testimony about the investigation

After Cook left, JK called her husband and told him someone had entered the apartment and sexually assaulted her. JK's husband testified that JK was crying. He told her to contact the police.

An officer who responded to JK's 911 call testified that when he spoke with JK, she appeared "nervous" and "fearful." VRP at 707. He said JK told him that when the assault began, she felt a hand around her neck. The responding officer did not observe any injuries. He recommended that JK "[g]o to the hospital to have an assault exam completed." VRP at 727-28.

The sexual assault nurse examiner who met with JK testified that she does "a head-to-toe assessment on every patient." VRP at 790. When asked if she saw bruising on various parts of JK's body, the nurse either responded, "No" or "Not that I noted in my documentation." VRP at 790-91. The nurse added that it can take days for bruising to appear.

Several years later, after DNA evidence identified Cook, officers showed JK a picture of Cook and asked her whether she knew him. JK said she did not.

C.    Cook's Testimony

Cook also testified. He said that in 2018, he was 5'10" tall and weighed between 185 and 200 pounds. He said he lived in JK's apartment complex and met JK a few times before the incident. When they first spoke, their conversation lasted two or three minutes, and Cook interpreted it as flirtatious. The second time they spoke, the conversation was "[a]lso flirtatious and a little more to the point." VRP at 939. The third time, JK asked Cook what he was doing later

that day. Cook testified, "[A]ny other time you hear that[,] you basically know what's going to happen next or what's liable to happen next." VRP at 940. Cook said JK told him to come to her apartment later and told him the patio door would be unlocked.

Cook testified that in the evening, he lightly knocked on JK's patio door. JK opened it and led Cook to her bedroom. Cook and JK tried having sex, but it was not comfortable for either of them, so Cook stopped, told JK "it wasn't working," and left. VRP at 947. Cook said he did not enter JK's apartment without her permission or force JK to have sexual contact with him.

The jury found Cook guilty of first degree rape and first degree burglary with sexual motivation.

Cook appeals his convictions.

## ANALYSIS

### I. SUFFICIENCY OF THE EVIDENCE

Cook argues that the State's evidence was insufficient to support his convictions for first degree rape and first degree burglary. We disagree.

"Evidence is sufficient to support a guilty verdict if any rational trier of fact, viewing the evidence in the light most favorable to the State, could find the elements of the charged crime beyond a reasonable doubt." *State v. Cardenas-Flores*, 189 Wn.2d 243, 265, 401 P.3d 19 (2017). A defendant challenging the sufficiency of the evidence "admits the truth of all of the State's evidence." *Id.* We draw "reasonable inferences in the State's favor." *Id.* at 266. "We consider both circumstantial and direct evidence as equally reliable and defer to the trier of fact on issues of conflicting testimony, witness credibility, and the persuasiveness of the evidence." *State v. Hernandez*, 172 Wn. App. 537, 543, 290 P.3d 1052 (2012).

To that end, when a person testifies that the defendant raped them and the defendant testifies that the intercourse was consensual, "[i]t is the role of the jury to weigh the credibility of this testimony, along with any surrounding facts and circumstances tending to support or discount the two conflicting accounts." *State v. Bright*, 129 Wn.2d 257, 272, 916 P.2d 922 (1996).

A.      First Degree Rape

A person commits first degree rape when they feloniously enter a building "where the victim is situated" and have sexual intercourse with the victim "by forcible compulsion." RCW 9A.44.040(1)(d).

It was undisputed at trial that Cook's DNA was on swabs taken from JK on the night of the rape. Cook argues that the State failed to prove he "feloniously entered [JK's] apartment" and "forcibly compelled [JK] to have intercourse with him." Appellant's Opening Br. at 25, 28. He contends that the evidence shows he "had consensual sex with [JK]." *Id.* at 29. He notes that during trial, JK testified that he strangled her for five to ten minutes, "suffocated her with a pillow, dragged her across the floor, pressed his weight against her, and forced intercourse upon her," but police and the nurse "did not observe any injuries." *Id.* at 30. He thus argues that no "reasonable juror could infer from the evidence that [the] alleged acts of force occurred." *Id.* at 31. We disagree.

1.      Felonious entry

Entry into a building is "felonious[] if it is unlawful and made with intent to commit a crime therein." *State v. Thomson*, 71 Wn. App. 634, 637-38, 861 P.2d 492 (1993). The entry "is unlawful if made without invitation, license[,] or privilege." *Id.* at 638.

Here, the State presented sufficient evidence that Cook entered JK's apartment unlawfully. JK testified that she did not invite Cook into her apartment. She said she woke up to Cook grabbing

her and pulling her to the floor. In light of her testimony, the fact that the patio door was unlocked is irrelevant, especially because JK said she did not leave the door unlocked for Cook and she did not even recognize who Cook was when law enforcement showed her a picture of him. And while Cook testified that JK let him in after he knocked on the door, we "defer to the trier of fact on issues of conflicting testimony" and "witness credibility." *Hernandez*, 172 Wn. App. at 543.

There is also sufficient evidence that Cook entered JK's apartment with the intent to commit a crime. JK testified that Cook hid from her and then physically incapacitated her: he waited underneath her bed, pulled her to the floor, pinned her to the ground, and choked her with a blanket or pillow. This testimony permitted a rational trier of fact to infer that Cook intended to commit a crime against her.

The State thus presented sufficient evidence of felonious entry.

2.    Forcible compulsion

Forcible compulsion includes physical force that "overcomes resistance, *or* a threat, express or implied, that places a person in fear of death or physical injury to [themselves] or another person." RCW 9A.44.010(3) (emphasis added).[3]

To show forcible compulsion through physical force that overcomes resistance, the State must show that the physical force was greater "than that which is normally required to achieve penetration." *State v. McKnight*, 54 Wn. App. 521, 528, 774 P.2d 532 (1989). Whether the victim resisted is a fact-specific "determination based on the totality of the circumstances, including the victim's words and conduct." *Id.* at 526 (holding that physical force overcame resistance where a

---

[3] We cite the current version of the statute because the relevant language has not changed.

17-year-old boy slowly pushed a naïve and physically weak 14-year-old girl down, took off her clothes, and initiated sexual contact despite her telling him to stop).

To show forcible compulsion through a threat, the State must show that the defendant "in some way communicated [an] intention to inflict physical injury in order to coerce compliance." *State v. Weisberg*, 65 Wn. App. 721, 726, 829 P.2d 252 (1992). The threat need not be verbal. *See id.* at 726; *State v. Gonzales*, 18 Wn. App. 701, 702, 571 P.2d 950 (1977) (holding that a guilty verdict necessarily reflected "a finding by the jury that the complaining witness submitted because of an *implied* threat of physical injury" where the defendant "forcibly dragged her" from a car and she "ultimately ceased to resist his insistent demands") (emphasis added).

Here, there is sufficient evidence that Cook used physical force that overcame JK's resistance. Cook used much more force than the defendant in *McKnight* used. Cook pulled JK to the floor, pinned her down, choked her with a blanket or pillow, and dragged her from the bedroom to the bathroom and back again. JK testified that she thought Cook would kill her if she resisted any more, so she "gave up resisting." VRP at 635. Moreover, JK's daughter was in the apartment, JK's two-year-old son was sleeping nearby, and Cook was much larger than JK. Therefore, a rational juror could find that her level of resistance was "reasonable under the circumstances." *McKnight*, 54 Wn. App. at 527. A rational juror could also find, based on JK's testimony, that Cook's use of physical force overcame her resistance.

There is also sufficient evidence that Cook nonverbally communicated an intention to inflict physical injury to coerce JK's compliance. JK testified that when Cook first choked her with a blanket or pillow, she said, "'Please don't kill me,'" and he immediately began choking her harder. VRP at 623. Additionally, as stated above, JK testified that she gave up resisting because

9

she thought Cook would kill her or might wake her children if she continued. Accepting JK's testimony as true, as we must, this evidence is sufficient for a rational juror to find that Cook engaged in forcible compulsion. *Cardenas-Flores*, 189 Wn.2d at 265.

While Cook argues that JK's account is inconsistent with her lack of observable injuries in the immediate aftermath of the incident, the nurse who examined JK testified that bruising can take days to appear. And the jury's verdict necessarily reflects its finding that JK's testimony was credible. We defer to the jury on issues of witness credibility. *Hernandez*, 172 Wn. App. at 543.

In sum, viewing the evidence in the light most favorable to the State, a rational trier of fact could find that Cook feloniously entered JK's apartment and had sexual intercourse with her by forcible compulsion. Sufficient evidence therefore supports Cook's first degree rape conviction.

B.      First Degree Burglary

A person commits first degree burglary when they enter or remain unlawfully in a building "with intent to commit a crime against a person" inside and then assault a person "while in the building." RCW 9A.52.020(1)(b).

Cook argues that the evidence shows "he had license to enter [JK's] apartment because she invited him in." Appellant's Opening Br. at 26. The State responds that Cook "forgets that a claim of insufficiency admits the truth of all the *State's* evidence, not his evidence, with all reasonable inferences from the evidence drawn in the State's favor." Br. of Resp't at 23. We agree with the State.

As explained above, there is sufficient evidence that Cook unlawfully entered JK's apartment without her permission, that Cook did so with the intent to commit a crime against JK,

and that Cook assaulted JK in the apartment. Sufficient evidence thus supports Cook's first degree burglary conviction.[4]

## II. RIGHT TO A FAIR TRIAL

Cook argues that use of the terms "rape kit" and "sexual assault kit" by the prosecutors and State witnesses denied him a fair trial because this use "undermined the presumption of innocence and invaded the province of the jury." Appellant's Opening Br. at 32. Specifically, he asserts that when the prosecutors used these terms, they committed misconduct by vouching for JK and that State witnesses gave "improper opinion testimony." *Id.* He contends that the "primary question before the jury at trial was whether the intercourse . . . was consensual," so it was "categorically unfair . . . for jurors to be presented with prejudicial evidence that assumes a rape has occurred." *Id.* at 40. We disagree.

The federal and state constitutions give criminal defendants the right to a fair trial by an impartial jury. *State v. Zamora*, 199 Wn.2d 698, 708, 512 P.3d 512 (2022). "As a quasi-judicial officer and a representative of the State, a prosecutor owes a duty to a defendant to see that their rights to a constitutionally fair trial are not violated." *Id.* A claim of prosecutorial misconduct therefore "directly implicates the constitutional right to a fair trial." *Id.* Similarly, "opinion testimony about the defendant's guilt invades this right." *State v. Johnson*, 152 Wn. App. 924, 934, 219 P.3d 958 (2009).

---

[4] At sentencing, the trial court concluded that the crimes of first degree rape and first degree burglary merged. The trial court ran the sentence for the rape conviction concurrently with the sentence for the burglary conviction.

A.     Prosecutorial Misconduct

"To prevail on a claim of prosecutorial misconduct, a defendant must show that 'in the context of the record and all of the circumstances of the trial, the prosecutor's conduct was both improper and prejudicial.'" *State v. Pinson*, 183 Wn. App. 411, 416, 333 P.3d 528 (2014) (quoting *In re Pers. Restraint of Glasmann*, 175 Wn.2d 696, 704, 286 P.3d 673 (2012) (plurality opinion)). Failure to object to the challenged conduct below waives any claim of error "unless the prosecutor's misconduct was so flagrant and [ill-intentioned] that an instruction could not have cured the resulting prejudice." *Id.*

Vouching is improper conduct, and it "occurs when the prosecutor expresses a personal belief in the veracity of a witness or indicates that evidence not presented at trial supports the testimony of a witness." *State v. Thorgerson*, 172 Wn.2d 438, 443, 258 P.3d 43 (2011).

Here, Cook did not object when the prosecuting attorney used the terms "rape kit" and "sexual assault kit" below, so he must show flagrant and ill-intentioned misconduct to prevail. But Cook cannot meet this burden because he has not demonstrated that the prosecution's use of these terms constituted improper vouching.

"Rape kit" and "sexual assault kit" are commonly used terms for the kits medical professionals use to collect evidence of possible sexual assaults. For example, the legislature uses the term "sexual assault kit." RCW 5.70.040. And our Supreme Court has used the term "rape kit." *See State v. Crumpton*, 181 Wn.2d 252, 264, 332 P.3d 448 (2014) (Stephens, J., dissenting); *State v. Thompson*, 173 Wn.2d 865, 869, 271 P.3d 204 (2012); *State v. Garcia-Salgado*, 170 Wn.2d 176, 186, 240 P.3d 153 (2010). Use of these terms was not argumentative: the terms are ubiquitous, and they would not convey to a jury that a rape or sexual assault certainly occurred. Thus, by referring

to an evidence collection kit as a "rape kit" and a "sexual assault kit," the prosecutors did not express a personal belief in the veracity of JK's testimony or indicate that evidence not presented at trial supported her testimony. Moreover, if requested, the trial court could have instructed the jury not to consider the terms "rape kit" or "sexual assault kit" as anything but common names for kits used to collect biological evidence.

Given that the prosecutors' conduct was not improper and an instruction could have cured any prejudice, Cook's claim of vouching by the prosecutors fails.

B.      Improper Opinion Testimony

Cook did not object to witnesses using the terms "rape kit" and "sexual assault kit" during trial. In general, we "may refuse to review any claim of error [that] was not raised in the trial court." RAP 2.5(a). But a party may raise a "manifest error affecting a constitutional right" for the first time on appeal. *Id.*

Whether a witness gave an opinion on the ultimate issue of the defendant's guilt is an issue of constitutional magnitude, as a defendant has "the right to a fair trial and an impartial jury." *Johnson*, 152 Wn. App. at 934. Under RAP 2.5(a), a constitutional error is manifest if the witness makes an explicit or nearly explicit statement expressing their opinion of the complaining witness's credibility. *State v. Case*, 13 Wn. App. 2d 657, 672, 466 P.3d 799 (2020).

As explained above, the terms "rape kit" and "sexual assault kit" are commonly used terms for a specific kind of evidence collection kit. Witnesses' use of these terms did not amount to a statement of opinion on JK's credibility because these terms alone did not suggest to the jury that it had to find that a rape or sexual assault actually occurred or that the defendant committed a sexual assault. There is no manifest error here.

III. INEFFECTIVE ASSISTANCE OF COUNSEL

Cook argues that he received ineffective assistance of counsel because defense counsel failed to object to the use of the terms "rape kit" and "sexual assault kit" and failed to properly cross-examine JK. Appellant's Opening Br. at 44. We disagree.

The federal and state constitutions guarantee the right to effective assistance of counsel. *State v. Estes*, 188 Wn.2d 450, 457, 395 P.3d 1045 (2017); U.S. CONST. amend. VI; WASH. CONST. art. I, § 22. To establish ineffective assistance of counsel, a defendant must show "'that counsel's performance was deficient' and that 'the deficient performance prejudiced the defense.'" *State v. Carson*, 184 Wn.2d 207, 216, 357 P.3d 1064 (2015) (emphasis omitted) (quoting *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)). To prevail, the defendant must meet both the deficiency requirement and the prejudice requirement. *Estes*, 188 Wn.2d at 457-58.

Counsel's performance was deficient if it fell "'below an objective standard of reasonableness based on consideration of all the circumstances.'" *Id.* at 458 (quoting *State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995)). To establish that counsel performed deficiently, the defendant must show that there were no "'legitimate strategic or tactical reasons supporting the challenged conduct.'" *State v. Emery*, 174 Wn.2d 741, 755, 278 P.3d 653 (2012) (quoting *McFarland*, 127 Wn.2d at 336). We strongly presume that counsel's representation was reasonable. *Estes*, 188 Wn.2d at 458. Counsel's deficient performance prejudices the defense "if there is a reasonable probability that 'but for counsel's deficient performance, the outcome of the proceedings would have been different.'" *Id.* (quoting *State v. Kyllo*, 166 Wn.2d 856, 862, 215 P.3d 177 (2009)).

A.      Failure to Object

Cook argues that he received ineffective assistance of counsel because defense counsel failed to object and request a curative instruction when the State and its witnesses used the terms "rape kit" and "sexual assault kit." This argument fails.

When and how an attorney objects is a "classic example of trial tactics." *State v. Vazquez*, 198 Wn.2d 239, 248, 494 P.3d 424 (2021). Here, defense counsel did not perform deficiently by failing to object to the terms "rape kit" and "sexual assault kit" or by failing to request a curative instruction. It was reasonable for defense counsel to refrain from objecting to the use of ubiquitous terms for a specific kind of evidence collection kit for fear of being perceived as protesting too much, as the jury would have easily recognized that it is the substance of the biological evidence, not the name of the test kit, that matters. In contrast, defense counsel *did* object when the State referred to the incident as a sexual assault, which shows defense counsel's diligence in identifying instances where the State's phrasing may have assumed a sexual assault actually occurred.

Cook has thus failed to meet his burden of demonstrating deficient performance.

B.      Failure to Properly Cross-Examine

Cook argues that defense counsel rendered ineffective assistance when cross-examining JK about her testimony that she knew the person who raped her was Black because of the way he smelled. We disagree.

Like other matters of trial strategy, courts generally entrust cross-examination techniques to attorneys' professional discretion. *In re Pers. Restraint of Davis*, 152 Wn.2d 647, 720, 101 P.3d 1 (2004). The possibility that a different attorney might have attacked a witness's credibility more

efficiently or extensively is not evidence of deficient performance so long as defense counsel's "approach falls within the range of reasonable representation." *Id.*

Here, defense counsel was not deficient in their cross-examination of JK. First, defense counsel pointed out that JK previously said she suspected Cook was Black because of his cologne. When JK attempted to clarify her previous statement but was inconsistent in her explanation of how she came to her conclusion, defense counsel pointedly asked, "So the man smelled in a way that made you think that he was [B]lack?" VRP at 887. Asking this question was a reasonable method of highlighting for the jury the inconsistencies in JK's testimony, the absurdity of the notion that Black people smell a particular way, and the racism embedded in that assertion. And because consent was at issue, not identity, cross-examination on this topic did not affect the factual issues presented to the jury: whether the encounter was consensual.

Cook has not met his burden of demonstrating that defense counsel deficiently failed to object, deficiently failed to request a curative instruction, or deficiently cross-examined JK. There is thus no basis for us to hold that Cook received ineffective assistance of counsel.

## CONCLUSION

We affirm Cook's convictions.

16

No. 58288-1-II

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
Glasgow, J.

We concur:

_____
Maxa, P.J.

_____
Lee, J.

17