# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 58565-1-II |
| Respondent, | |
| v. | UNPUBLISHED OPINION |
| MICHAEL EUGENE BEAUCHAMP, | |
| Appellant. | |

PRICE, J. — Ginger Gover disappeared in the Summer of 2018. About six weeks later, her remains were found in a wooded area. Following an investigation, Michael E. Beauchamp was arrested and charged with Gover's murder. Beauchamp was later convicted of aggravated first degree murder and second degree malicious mischief.

Beauchamp appeals, arguing that (1) the trial court made multiple evidentiary errors during trial, (2) the State committed prosecutorial misconduct both during its questioning of a witness related to Beauchamp's potential persistent offender status and during its closing argument, and (3) the State presented insufficient evidence for his murder conviction. We reject each of Beauchamp's arguments and affirm.

## FACTS

I. BACKGROUND

Beauchamp and Gover knew each other. In May and June of 2018, Beauchamp and Gover repeatedly burglarized the home of Clifford Rice and his wife, who were out of town for several

months. Over time, Beauchamp apparently became concerned that he and Gover had left behind DNA and other identifying evidence at the Rice home. He told multiple friends he had to "clean up some DNA" from the residence. 8 Verbatim Rep. of Proc. (VRP) at 1208; 14 VRP at 2251; 15 VRP at 2361, 2386, 2391.

On June 12, 2018, the local fire department responded to a report of a fire at the Rice residence. The day prior, Beauchamp and Gover were seen across the street from the home. And later Beauchamp was seen at Gover's residence smelling strongly of gasoline. Beauchamp later told friends he started the fire at the Rice home to cover up evidence.

Rice, back in town, reported to law enforcement that his vehicle had been stolen. Soon after, law enforcement was able to connect Rice's stolen vehicle to Gover. Law enforcement had obtained video recordings from the parking lot where Rice's vehicle was found. The video showed another car, a silver Honda with additional distinctive features, enter the lot at the same time that Rice's car was abandoned. The silver Honda was later identified as Gover's car. Law enforcement obtained a warrant to seize Gover's silver Honda.

On July 13, Detective Clark arrived at Gover's residence to execute the warrant. In the course of seizing Gover's car, the detective spoke to Gover and asked if she would be willing to cooperate with their investigation into the burglary and arson. Gover responded by telling the detective she wanted to speak to a lawyer. But unbeknownst to Detective Clark, Beauchamp was present at Gover's home and apparently could overhear Gover's interaction with the detective.

After Gover lost the use of her silver Honda, she began driving a friend's green Honda. The green Honda had some conspicuous features, including a removable rainbow steering wheel and two Falken brand tires.

On July 29, two weeks after the seizure of her car, Gover went to Beauchamp's house to have a tire fixed on the green Honda. Gover had plans to meet her friend, Mary Logan, later that afternoon, but Gover was never seen or heard from again.

About one week later, on August 6, the green Honda was found near a storage facility. The car had been cut up and stripped down, with many recognizable parts either removed or missing, and some of its vehicle identification numbers (VINs) also removed.

About six weeks later, on September 13, a truck driver found partially buried skeletal remains in a heavily wooded area that was undergoing new development. In the month and a half prior to this discovery, the truck driver and the property owner told police that some individuals and vehicles that appeared to be out-of-place had been seen on the property.

After initial review at the scene, the remains were excavated and transported to the medical examiner's office. A forensic pathologist, with the assistance of a forensic anthropologist, examined the significantly decomposed, almost skeletonized remains. The body was identified as Gover's through orthopedic records, which matched a metal plate in the ankle bone. A Falken brand tire was also found 50 feet from Gover's remains.

Following the chemical removal of remaining soft tissue, the medical examiner identified a nine millimeter defect in Gover's left pelvic bone that was consistent with a gunshot wound. Later forensic testing confirmed that metal in the cavity was consistent with a bullet. The bullet trajectory went through the soft tissues and organs of the pelvis, causing Gover's death.

On October 8, detectives executed a search warrant on Beauchamp's residence and found evidence tied to the green Honda. They found a wooden flatbed trailer with gouges in the bed, along with equipment capable of moving a vehicle onto the trailer. In the bed of a black truck, law

enforcement also found a tire with a black metal rim matching the front passenger tire on the green Honda.

Following the investigation, the State charged Beauchamp with aggravated first degree murder with two aggravating circumstances: that the murder was related to Gover's role as a prospective witness in a proceeding and that the murder was committed to avoid prosecution as a persistent offender.[1] The State also charged Beauchamp, as lesser included offenses, with second degree murder and first degree assault. Finally, the State charged him with second degree malicious mischief and unlawful possession of a firearm.[2] Each charged crime, except unlawful possession of a firearm, included a firearm sentencing enhancement.

II. PRETRIAL ORDER BIFURCATING PERSISTENT OFFENDER AGGRAVATOR

Prior to trial, Beauchamp filed a motion to bifurcate the two alleged aggravators into a separate proceeding. The trial court granted in part and denied in part. The trial court refused to bifurcate the aggravator related to Gover's role as a potential witness but granted bifurcation as to the aggravator related to avoiding prosecution as a persistent offender. Accordingly, the trial court ruled the State could not offer any evidence related to Beauchamp's potential status as a persistent offender, including any evidence of his past "most serious" offenses. Clerk's Papers (CP) at 416.

---

[1] *See* RCW 9.94A.570.

[2] The charge of unlawful possession of a firearm was based on the discovery of a .25 caliber handgun during law enforcement's search of Beauchamp's residence. The .25 caliber gun was later excluded as a possible murder weapon. The charge was severed from the charges related to Gover. Beauchamp separately pleaded guilty to the charge, and it was ultimately added to the judgment and sentence for the charges related to Gover.

III.  TRIAL TESTIMONY

Trial began in May of 2023 and continued for over a month.  The State called numerous witnesses who testified consistently with the above facts.

A.  TESTIMONY GOVER WAS WITH BEAUCHAMP THE DAY SHE DISAPPEARED

Patricia Lessor, who lived with Beauchamp, testified about seeing Gover on the day she got help with the green Honda's tire, the last day Gover was seen alive.  Lessor testified that when she got home that day, Gover was at the residence with Beauchamp getting Gover's tire fixed.  Lessor recalled this as unusual because, to her knowledge, Gover had never been at the house alone with just Beauchamp before and they were together locked in his garage.  Lessor left Gover and Beauchamp alone and went into the main house to sleep.

B.  TESTIMONY BEAUCHAMP WAS CONCERNED ABOUT GETTING CAUGHT BECAUSE OF GOVER

Several of Beauchamp's friends testified that Beauchamp was worried that law enforcement would connect him to the burglary and arson of the Rice home.  Shellie Slye testified that during the summer of 2018, Beauchamp told her that he and a woman had stolen guns, antiques, and a Toyota from a house and that the house had later burned down.  Beauchamp, referencing the woman with whom he had stolen the items, said that "the bitch rolled on me, so she had to disappear."  15 VRP at 2365, 2396.

Gover's friend, Mary Logan, testified that Beauchamp told her about a house that burned down and that he was "[p]anicked" that Gover might have provided information to law enforcement.  14 VRP at 2138; 15 VRP at 2287.  When questioning Logan, the State asked about Beauchamp's fear of being caught for the burglary:

[State:] Did [Beauchamp] say what he thought might happen to him if he got caught?

[Logan:] Oh, he'd go to prison forever, you know.

[State:] Did he mention anything about whether this would be a strike?

[Logan:] Yes.

14 VRP at 2138. Beauchamp quickly objected and requested a mistrial, claiming that the State had violated the trial court's ruling to exclude evidence of Beauchamp's prior strike offenses. Alternatively, if the trial court denied his motion to mistrial, Beauchamp asked the trial court to instruct the jury to disregard the entire exchange regarding "whether or not he was concerned about going to prison for life and whether or not this was a strike offense." 14 VRP at 2143.

The trial court denied the motion, reasoning that Logan had not testified that Beauchamp was subject to life in prison as a persistent offender in violation of the pretrial ruling. The trial court observed that the use of the word "forever," did not violate its order because the "forever" could mean different things considering, for example, the defendant's age. 14 VRP at 2144, 2146.

Beauchamp reiterated that the trial court should strike the entire exchange. Beauchamp argued that, when read together, Logan's responses conveyed that the "fear of a strike offense is fear of going to prison for life without parole." 14 VRP at 2147. Before the trial court could respond, the State conceded that, "if the defense is adamant that [the jury] should be instructed. I don't have a problem with that." 14 VRP at 2147. The trial court then instructed the jury to disregard Logan's last response that related specifically to the word "strike." 14 VRP at 2150.

C. TESTIMONY BEAUCHAMP CARRIED A GUN

Another of Beauchamp's friends, Talea Thompson, testified that Beauchamp also spoke with her about a "robbery" that he had committed with a female friend. 13 VRP 1956. Beauchamp said that the other woman was a "greedy bitch" and had "snitched to the cops." 13 VRP at 1956-57.

Thompson also testified that she saw Beauchamp carrying a gun around the time of Gover's disappearance, near the end of September or early October. Beauchamp immediately objected to Thompson's testimony, arguing that his possession of a gun was irrelevant and unfairly prejudicial if the gun could not be connected to Gover's death. Beauchamp also argued that the testimony was inadmissible under ER 404(b). The trial court initially sustained the objection on ER 403 grounds because the gun Thomspon observed was "more than likely the .25 caliber" handgun that had been found at Beauchamp's residence and excluded as a possible murder weapon. 13 VRP at 2003.

The State then made an offer of proof by questioning Thompson outside the presence of the jury. Thompson explained that she only saw the black and grey butt of a gun in a backpack. She knew it was a handgun but could not say whether it was a revolver or a semi-automatic, nor could she determine the caliber of the gun. But when shown a picture of the .25 caliber handgun that had been excluded as a possible murder weapon, Thompson confirmed that the gun she saw in Beauchamp's possession was not the same gun because their butts were not the same. Based on the offer of proof, the trial court reversed its ruling, deciding that because the weapon could not be excluded from being the murder weapon, it was relevant. With the jury back in the courtroom, Thompson testified that she saw the butt of a gun in Beauchamp's backpack.

D.  TESTIMONY OF THE GREEN HONDA'S DESTRUCTION AND BEAUCHAMP'S ROLE

Detective Brian Stepp, a member of the Puget Sound Auto Theft Task Force, testified about vehicular destruction and his observations of the recovered green Honda.  He explained that there were different kinds of vehicular destruction.  If a person takes a car to sell its parts, "they . . . typically take doors, hood, steering wheel, stereo, seats, the carpeting . . . [and] detach the seatbelts.  Everything [that] can be resold and put back into a like car."  20 VRP at 3056.  When a car is being disassembled in this way, the people removing the parts take steps to try to avoid damaging the parts of value.  It is also common for criminals to destroy a car's VIN number to avoid being found.

The detective further explained that when a car is found completely destroyed, it is generally for destruction's sake.  The most common means of destroying a car is to "completely" cut it up, but burning is also common.  20 VRP at 3083.

Detective Stepp then went on to describe his observations of the green Honda.  He detailed the condition of the vehicle's interior and exterior components.  The detective explained that the car was missing a steering wheel and stereo and that the seat belts had been cut at the attachment points.  He also explained that the car was missing its roof, windshield, doors, and seats, in addition to its rear axle and tires.  He expressed that the state of the Honda's roof was particularly noteworthy compared to other cars he had investigated.  He explained that he rarely saw vehicles missing the roof and that, in this case, "the roof [had] been cut all the way across and removed from the vehicle."  20 VRP at 3070.  The detective further observed that a portion of metal was missing from the floor of the Honda.  The missing piece of metal appeared to be physically cut out and removed.

Based on his experience, Detective Stepp explained that the kinds of cuts he observed on the vehicle seemed "vindictive." 20 VRP at 3081. He further explained that there was no financial reason to physically cut and remove the piece of metal from the vehicle's floor. The detective was then asked if he was familiar with cars being destroyed to conceal evidence of a crime and if the green Honda was damaged in such a manner.

> [State:] Have you . . . examined vehicles that have been destroyed to conceal evidence?
>
> [Det. Stepp:] Yes.

20 VRP at 3081-82. Beauchamp objected but was overruled. The State continued,

> [State:] Based on your training and experience with the Puget Sound Auto Theft Task Force, do you believe that there was damage [to the green Honda] consistent with removal to hide evidence?
>
> [Det. Stepp:] Yes.

20 VRP at 3156. Again, Beauchamp objected but was overruled.

Cory Ballard, an acquaintance of Beauchamp's, testified that Beauchamp was responsible for the destruction of the green Honda. Ballard said that he helped Beauchamp "cut up" a green Honda with a "rainbow-colored detachable steering wheel." 8 VRP at 1229. As Ballard worked to remove bolts and cut the motor, Beauchamp used a Sawzall metal cutter on the roof. Ballard also noticed that Beauchamp was wearing thick winter gloves, despite it being a hot summer day. When he asked Beauchamp about the gloves, Beauchamp responded, saying, "Something like, 'Capital crime, capital punishment.' " 8 VRP at 1234.

E. TESTIMONY OF THE AUTOPSY PROCESS AND DISPUTE OVER RELATED PHOTOS

Dr. Megan Quinn, a forensic pathologist with the Pierce County Medical Examiner's Office, conducted the autopsy of Gover's remains. During Dr. Quinn's testimony, the State began

to offer photographs of the remains.  Beauchamp objected and the trial court heard arguments outside the presence of the jury.[3]

Beauchamp argued that the trial court should limit the number of photographs due to their gruesome nature.  He argued that the photos were of little probative value and would inflame the jury.  Beauchamp claimed that because the photos "ha[d] nothing to do with" the medical examiner's identification of the victim or her cause of death, the photos were unnecessary and should not be admitted, especially one photo that showed Gover's skull.  10 VRP at 1608. Beauchamp further argued that there were other photos to which he did not object that were sufficient for the State to prove its case.

The State responded that it had carefully selected each of the proposed exhibits from a large number of photographs and that each was important to show the process of the recovery of the remains and the autopsy.  The State explained that this autopsy was irregular because the recovered remains did not have soft tissue or organs.  Consequently, Dr. Quinn required the assistance of a forensic anthropologist and needed to look carefully at the skeletal remains at various stages together with other recovered items, and lack thereof, to conclude what injury was sustained and whether it was a gunshot wound.  The State argued each photo helped explain the examiner's findings, particularly in light of the irregular conditions.

---

[3] During jury selection, the possibility of viewing graphic photographs, including autopsy photographs, was discussed.  Two prospective jurors were excused because they expressed concern with viewing such images.

The trial court overruled Beauchamp's objection. The trial court found that the prosecution had used proper restraint by limiting the number of photos and that the photos would help the medical examiner explain her findings. It explained,

> I do not find, based on my review, that the cumulative effect of these photographs are so inflammatory that . . . the jury [would] be overcome by its passion or prejudice. I will also note that, given the photographs themselves and the discovery of the body in this state, there's little other way to explain the findings of a pathologist except with the skeletal remains.

10 VRP at 1612. The trial court also found that the singular photograph of the skull was admissible for the purpose of explaining the condition of the entire body as a whole at the time of the recovery.

Accordingly, the trial court allowed the State to introduce, in total, 15 photos of Gover's remains and decayed clothes.

### F. CELL PHONE RECORDS AND VIDEO SURVEILLANCE CONFIRM GOVER'S LOCATION ON THE DAY OF HER DISAPPEARANCE

Detectives Ryan Salmon and Brent Van Dyke testified and explained how cell phone data and video surveillance helped establish Gover's movements leading up to her disappearance on July 29, 2018. Video surveillance showed Gover pull into a gas station in the green Honda at around 9:30 a.m. At 11:10 a.m., the green Honda was seen leaving the gas station. Cell phone records then indicated that Gover's phone was located at Beauchamp's house at 11:45 a.m. By 1:30 p.m., Gover's phone stopped communicating with cell towers.

### IV. CLOSING ARGUMENTS

During the State's closing arguments, the State described the evidence connecting Beauchamp to Gover's death and described the events leading up to her death. The State discussed Beauchamp's motive to kill Gover based on his fear of being caught for the burglary and arson at

11

the Rice residence.  The State explained that Beauchamp had opportunity when Gover went to his

house on the day she disappeared to get her tire fixed.  And the State explained that cell phone

records placed her at his house at the time of her disappearance.  After summarizing the rest of the

evidence, the State concluded by saying,

> That's the evidence in this case.  And the State has proven beyond a reasonable doubt that [Beauchamp] shot her at least once in the pelvis [and] that led to her death.  She was a prospective witness in the [Rice residence] burglary and arson, and he shot her to conceal his culpability and his complicity, and the State has proven each . . . and every charge.

25 VRP at 3942.

In his closing argument, Beauchamp claimed that he had been accused of murder based on

"whispers," "rumors," "lying," and witnesses' own efforts to protect themselves.  25 VRP at 3948,

3998.  Beauchamp explained,

> They're all telling stories.  They're all filling in the holes.  They're all basically responding to what they know, because they're trying to protect themselves.  They don't care about anyone other than themselves, and they will say what they have to say to either protect themselves from the robbery or being accused of the robbery, to protect themselves from being accused of the arson, to protect themselves from being accused of the—being involved in chopping up the car.  For whatever reason, they are lying.  They are protecting themselves or someone they actually do care about.

25 VRP at 3998.  Beauchamp argued that law enforcement presumed from the beginning that he

was guilty, comparing it to painting bullseye targets around arrows.  Beauchamp was the arrow

and law enforcement painted a bullseye around him and "got" witnesses to corroborate their

theory.  *See* 25 VRP at 3953, 4000.  Beauchamp further argued that law enforcement did not want

to adequately investigate Gover's death because "the truth would get in the way of a conviction."

25 VRP at 4001.  Beauchamp claimed that instead of adequately confirming witness reports and

investigating witness accounts, law enforcement "c[a]me up with a story." 25 VRP at 4001.

Beauchamp suggested law enforcement's thought process went like this,

> [B]y the time [the witness] finally told me, it had been several years, and apparently, I just couldn't be bothered to do a little foot work, track down [corroborating evidence], and figure it out. Because you know what? I've already painted my circle and shot my arrow. I've already proven that supposedly, according to [the witness], Ginger Gover was actually [at Beauchamp's] on July 29th, 2018. Why would I want to do an investigation that might prove me wrong? Why? Certainly it would . . . get in the way of a conviction.

25 VRP at 4001.

In rebuttal, the State responded by repeatedly characterizing Beauchamp's argument as a "grand conspiracy" theory that was unsupported. Beauchamp objected each time to the State's use of this "grand conspiracy" characterization, but the trial court overruled the objections. 25 VRP at 4011, 4016-20.

The State argued that the simplest and most likely explanation of the case from the evidence was that Beauchamp murdered Gover. The State used the analogy of "Occam's Razor"[4]:

> I want to pose another concept to you, ladies and gentlemen. The concept of Occam's [R]azor. The concept of the simplest explanation is generally the most correct. What is the simplest explanation? That three separate groups of people got together to create conspiracies to protect themselves and their own interest, and those three separate sets of people just happened to decide that the same guy, half of their friend, is the person that they're going to [point the] finger for murder? Not even for the crimes that they're trying to protect themselves from? No. Murder. Is that the most likely explanation? Or is the most likely explanation the one that you reach when you consider the totality of the evidence together?

25 VRP at 4011-12.

---

[4] "Occam's Razor instructs '*Entia non sunt multiplicanda praeter necessitate,*' which translates into today's vernacular as 'Keep it simple.'" *Young v. Young*, 164 Wn.2d 477, 483 n.3, 191 P.3d 1258 (2008).

Beauchamp objected, arguing that this was a mischaracterization of the law. The trial court overruled the objection.

V. VERDICT AND SENTENCING

Following deliberations, the jury found Beauchamp guilty as charged, including both aggravators.[5]

Following the vacation of some counts to avoid double jeopardy, the trial court convicted Beauchamp of aggravated first degree murder (while armed with a firearm), second degree malicious mischief, and unlawful possession of a firearm.[6] The trial court imposed a mandatory sentence of life without the possibility of release on the aggravated first degree murder.[7]

Beauchamp appeals.

ANALYSIS

Beauchamp appeals, making three main arguments. He argues that (1) the trial court made multiple evidentiary errors during trial, (2) the State committed prosecutorial misconduct both during its questioning of a witness related to Beauchamp's potential persistent offender status and during its closing argument, and (3) the State presented insufficient evidence for his murder conviction.

---

[5] In a second phase, the jury found the aggravator related to Beauchamp's potential status as a persistent offender who committed the murder to avoid prosecution.

[6] The unlawful possession of a firearm conviction is based on the severed charge unrelated to Gover's murder to which Beauchamp had earlier pleaded guilty.

[7] The sentences for second degree malicious mischief and unlawful possession of a firearm were to run concurrently to the life sentence.

I. EVIDENTIARY RULINGS

Beauchamp argues that the trial court made three evidentiary errors. First, Beauchamp argues that the trial court erred by admitting Talea Thompson's testimony that Beauchamp had a gun. Second, Beauchamp argues that the trial court erred by allowing Detective Stepp to offer improper opinion testimony. Third, Beauchamp argues that the trial court erred by allowing the State to offer unduly prejudicial photographs of Gover's remains.

Each of Beauchamp's assignments of error is an evidentiary ruling that is reviewed for abuse of discretion. *See State v. Luvene*, 127 Wn.2d 690, 708, 903 P.2d 960 (1995) (gun possession); *State v. Blake*, 172 Wn. App. 515, 523, 298 P.3d 769 (2012) (opinion evidence), *review denied*, 177 Wn.2d 1010 (2013); *State v. Yates*, 161 Wn.2d 714, 768, 168 P.3d 359 (2007) (autopsy photographs), *abrogated on other grounds by State v. Gregory*, 192 Wn.2d 1, 427 P.3d 621 (2018). An abuse of discretion occurs when the decision was manifestly unreasonable or based on untenable grounds or reasons. *State v. Gunderson*, 181 Wn.2d 916, 922, 337 P.3d 1090 (2014).

A. TALEA THOMPSON'S TESTIMONY ABOUT SEEING A GUN

Beauchamp's first evidentiary argument is that the trial court erred by allowing Thompson to testify that she saw Beauchamp in possession of a firearm. He contends the evidence was irrelevant under ER 401, unfairly prejudicial under ER 403, and inadmissible evidence of prior bad acts under ER 404(b). We disagree.

The trial court can only admit relevant evidence. ER 401. " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the

determination of the action more probable or less probable than it would be without the evidence." ER 401.

Beauchamp argues that Thompson's testimony regarding Beauchamp's gun possession is irrelevant because there "was absolutely zero testimony" connecting the weapon Thomspon observed to Gover's cause of death. Br. of Appellant at 25. We are unpersuaded. Proof that the gun was the same gun that was used in Gover's murder was not necessary to make the testimony relevant; the fact that the gun could have been used in the murder is enough to make it relevant under ER 401. *Luvene*, 127 Wn.2d at 708; *see also State v. Jeffries*, 105 Wn.2d 398, 412, 717 P.2d 722 (1986) (plurality opinion) (determining that firearms in the defendant's possession that could have been the murder weapon were relevant in murder case under ER 404(b)).

Beauchamp's argument under ER 403 is arguably more viable. Even if relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. ER 403. ER 403 is concerned with unfair prejudice, which generally means the evidence is more likely to create an emotional response from a jury instead of a rational decision. *State v. Cecil*, 34 Wn. App. 2d 569, 586, 571 P.3d 1255 (2025). Trial courts are given wide discretion when balancing the probative value of evidence against the potential prejudicial effect under ER 403. *State v. Rivers*, 129 Wn.2d 697, 710, 921 P.2d 495 (1996).

Here, Beauchamp argues that Thompson's testimony is "highly prejudicial." Br. of Appellant at 25. Beauchamp explains that because Thompson only saw the butt of the gun and could not confirm the caliber or type of gun, Thompson's testimony could not support a reasonable inference that the gun she observed was consistent with the one used in Gover's murder. Because there is only a "modicum of commonality" between the gun in his possession and the murder

weapon (both likely being handguns), the prejudicial effect of the testimony clearly outweighs whatever marginal relevance the testimony provided. Reply Br. of Appellant at 13.

We disagree that the trial court abused its discretion. The trial court initially excluded Thompson's testimony when it believed that the gun in Beauchamp's possession could have been the .25 caliber firearm that had been excluded (and determined not to be the murder weapon). But once the trial court determined the gun was likely not the .25 caliber weapon, its relevance increased considering that it could have been the gun that killed Gover. We agree that the lack of a confirmed direct connection between the gun that Thompson observed and the murder weapon raises the potential prejudice of this testimony. Nevertheless, given the wide discretion afforded trial courts in conducting ER 403 balancing, we cannot say that the trial court's decision was manifestly unreasonable or based on untenable grounds or reasons. *See Gunderson*, 181 Wn.2d at 922. Thus, Beauchamp has failed to demonstrate an abuse of discretion based on ER 403 grounds.

Finally, Beauchamp argues the trial court improperly admitted Thompson's testimony about the gun under ER 404(b). ER 404(b) states, "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." We disagree that ER 404(b) is applicable. Thompson's testimony about Beauchamp carrying a gun was relevant to this crime by providing circumstantial evidence that Beauchamp had access to a means of killing Gover. Thompson's testimony was not "evidence of other crimes, wrongs, or acts" under ER 404(b).[8]

---

[8] Beauchamp also argues that the improper admission of Thomspon's testimony likely affected the outcome of Beauchamp's trial. However, because this evidence was not improperly admitted, we do not analyze its effect on the outcome of the trial.

The trial court did not abuse its discretion in admitting Thompson's testimony about seeing Beauchamp with a gun under ER 401, ER 403, or ER 404(b).

B.  DETECTIVE STEPP'S TESTIMONY—OPINION TESTIMONY ABOUT GREEN HONDA

Beauchamp's next evidentiary argument is that Detective Stepp provided an improper opinion on Beauchamp's guilt when he testified that the green Honda was destroyed with the intent to conceal a crime.  We disagree.

Expert witnesses can use their qualifications and experience to help the jury "understand the evidence or to determine a fact in issue" so long as that testimony is generally accepted by the scientific community.  ER 702; *State v. Dunn*, 125 Wn. App. 582, 589, 105 P.3d 1022 (2005). However, witnesses cannot generally tell the jury their "personal belief, as to the guilt of the defendant, the intent of the accused, or the veracity of witnesses."  *State v. Montgomery*, 163 Wn.2d 577, 591, 183 P.3d 267 (2008) (plurality opinion).  Improper opinions of a defendant's guilt violate the right to a fair trial and the right to have an impartial jury "make an independent evaluation of the facts." *State v. Bar*, 123 Wn. App. 373, 380, 98 P.3d 518 (2004), *review denied*, 154 Wn.2d 1009 (2005). However, "if the testimony does not directly comment on the defendant's guilt or veracity, helps the jury, and is based on inferences from the evidence, it is not improper opinion testimony." *State v. Johnson*, 152 Wn. App. 924, 930-31, 219 P.3d 958 (2009).  Even if an expert's opinion pertains to the ultimate issue, the testimony is not improper, so long as it does not directly speak to the defendant's guilt. *City of Seattle v. Heatley*, 70 Wn. App. 573, 579, 854 P.2d 658 (1993), *review denied*, 123 Wn.2d 1011 (1994).

Here, Beauchamp points to Detective Stepp's testimony that based on his observations of the green Honda, its condition was consistent with somebody trying to "hide evidence."  20 VRP

18

at 3156.  Beauchamp argues that this testimony was improper because while it may not have been a direct comment on guilt, "it was the necessary implication of such testimony."  Br. of Appellant at 35.  He further explains that "[t]he natural inference from an opinion that Mr. Beauchamp destroyed Ms. Gover's car to conceal evidence that Mr. Beauchamp did so because he was guilty of harming her."  Br. of Appellant at 35.

We are not persuaded that Detective Stepp's testimony was improper.  First, there was no direct opinion on Beauchamp's guilt.  *Johnson*, 152 Wn. App. at 930-31.  The detective offered no opinion that any particular person, Beauchamp or anyone else for that matter, destroyed the vehicle.  Nor did the detective testify as to any linkage between the person who destroyed the vehicle and the person who murdered Gover.  Second, the testimony would have been helpful to the jury.  *Id.*  The average juror would have no understanding about vehicle destruction (including the different types and characteristics).  Describing the features of the green Honda's destruction and those features' relevance to the likely purpose of the destruction would certainly be helpful to the jury.  Third, as the detective well explained, his testimony was based on reasonable inferences from the evidence, specifically the destruction of various VINs, the removal of metal from the frame that had no monetary value, and the fact that several auto parts of value were left with the vehicle.  *Id.*  The detective explained how these facts, in his experience, support the opinion that the car was destroyed to conceal a crime, not for financial gain.  And even though Detective Stepp's expert testimony may have arguably pertained to the ultimate issue, that alone does not make his opinion improper.  *Heatley*, 70 Wn. App. at 579.  Thus, Detective Stepp's testimony was not an improper opinion on guilt.  *Johnson*, 152 Wn. App. at 930-31.

C.  AUTOPSY PHOTOGRAPHS OF GOVER'S REMAINS

Beauchamp's third evidentiary argument is that the trial court erred when it allowed the State to introduce numerous photographs of the recovery of Gover's remains and the autopsy. Beauchamp specifically highlights one photo of Gover's skull, exhibit 166, as being especially prejudicial.  We disagree that the trial court abused its discretion.

Photographs, even those that are difficult to view, are admissible if the trial court determines their probative value outweighs their prejudicial effect.  *State v. Davis*, 141 Wn.2d 798, 853, 10 P.3d 977 (2000), *see Yates*, 161 Wn.2d at 768 (autopsy photographs are admissible if they are "accurate" and "their probative value outweighs their prejudicial effect").  Graphic photos can be necessary because " '[a] bloody, brutal crime cannot be explained to a jury in a lily-white manner.' "  *See State v. Whitaker*, 6 Wn. App. 2d 1, 35-36, 429 P.3d 512 (2018) (quoting *State v. Whitaker*, 133 Wn. App. 199, 227, 135 P.3d 923 (2006)), *review granted in part*, 193 Wn.2d 1012 (2019).  Indeed, autopsy photos often have probative value when they are used to illustrate or explain the testimony of the pathologist who performed the autopsy.  *State v. Brett*, 126 Wn.2d 136, 160, 892 P.2d 29 (1995).

But there are limits.  The State does not have "carte blanche to introduce every piece of admissible evidence if the cumulative effect of such evidence is inflammatory and unnecessary." *State v. Crenshaw*, 98 Wn.2d 789, 807, 659 P.2d 488 (1983).  The State must exercise, and the trial court must ensure, caution and restraint when it comes to "gruesome and repetitive" photographs.  *Id.*  However, because of the need for trial court discretion in this area, appellate courts will uphold the decision of the trial court, " '[u]nless it is clear from the record that the

primary reason to admit gruesome photographs is to inflame the jury's passion . . . .' " *Whitaker*, 6 Wn. App. 2d at 36 (quoting *Whitaker*, 133 Wn. App. at 277).

Here, Beauchamp argues that the trial court erred when it allowed the State to admit "multiple gruesome images" of Gover's remains because they were unnecessary. Br. of Appellant at 40. Beauchamp argues that none of the autopsy photos to which he objected showed Gover's cause of death nor did they explain the autopsy process. He also argues that "a deep dive into the autopsy process was not needed to counter Mr. Beauchamp's defense." Br. of Appellant at 43. Moreover, Beauchamp asserts that there were some photos to which he did not object and that those photos were sufficient to show the condition of the remains and the actual injury that was the cause of death.

Beauchamp further argues that the improper admission of these photos materially affected the verdict. Because "the purpose of [the] gruesome photos was to tug at the jury's heartstrings and compel them to punish someone for Ms. Gover's death," Beauchamp contends that the jury overlooked the problems with the State's case and wrongfully convicted Beauchamp. Br. of Appellant at 45. He argues an image of Gover's skull, exhibit 166, was especially prejudicial and that collectively the photos were unsettling, unnecessary, and excessive. Being forced to view them unnecessarily, Beauchamp suggests, would create in the jury a desire to "do right" by Gover "whose remains [were] laid out starkly before them." Br. of Appellant at 45.

In response, the State contends that it was selective when it chose the limited number of photographs that were relevant to the autopsy process out of the many images that it had. Each photo "w[as] relevant and illustrative of the autopsy process and used by the medical examiner to explain her process and findings." Br. of Resp't at 34. The State asserts that evidence of the fatal

injury and proof of the credibility of the cause of death determination were both essential to prove the murder.

Moreover, the State argues that the photos were not that gruesome. The State explains that half of the challenged photographs—exhibits 178-83—depicted clothing, and the remaining six— exhibits 166-68 and 174-76—"were free of blood, gore, or a sympathetic image of a recently-deceased person." Br. of Resp't at 37. Absent a clear showing that the primary reason to admit the "gruesome photographs" was to inflame the jury, the State contends that the trial court properly exercised its discretion to admit the photographs.

We agree with the State. The State was required to prove every element of its case, including the cause of Gover's death. And a critical aspect of the case was how and where Gover's remains were found. Especially given the circumstantial nature of the State's overall case, the cause of Gover's death required explanation. The discovery of the remains and the process of the autopsy were important to this explanation. The photographs were certainly relevant to this process as they documented how Gover's remains were discovered, organized, cleaned, and analyzed. *Brett*, 126 Wn.2d at 160. As the trial court said, "[T]here's little other way to explain the findings of a pathologist except with the skeletal remains." 10 VRP at 1612.

Still, the relevance of the images needed to be balanced with their potential prejudice. And after viewing the images, the trial court did precisely this, concluding, "I do not find, based on my review, that the cumulative effect of these photographs are so inflammatory that . . . the jury [would] be overcome by its passion or prejudice." 10 VRP at 1612.

In our review of the images, this conclusion was reasonable. To be sure, the photographs were unpleasant. But we disagree that the photos, even exhibit 166 (Gover's skull), were overly

22

gruesome, especially in the context of a murder case where uncomfortable images are inevitable. *See Whitaker*, 133 Wn. App. at 227. Moreover, given the State's need to explain the condition and analysis of the remains, there is nothing in the record suggesting that " the primary reason to admit [the] gruesome photographs [was] to inflame the jury's passion . . . .' " *Whitaker*, 6 Wn. App. 2d at 36 (quoting *Whitaker*, 133 Wn. App. at 277). Because the danger of prejudice does not outweigh the photos' probative value, and nothing in the record indicates an improper purpose to inflame the jury, the trial court did not abuse its discretion by admitting the photographs of Gover's remains.

## II. PROSECUTORIAL MISCONDUCT

Beauchamp argues that the State committed prosecutorial misconduct both during examination of Mary Logan and during the State's rebuttal closing argument.

To prevail on a claim of prosecutorial misconduct, a defendant must first demonstrate that the prosecutor's statements were improper and, second, that they were prejudicial. *State v. Magers*, 164 Wn.2d 174, 191, 189 P.3d 126 (2008). Whether a prosecutor's statements are improper and prejudicial is evaluated in the context of the entire record. *Id.* Prejudice occurs when " 'within reasonable probabilities, the outcome of the trial would have been materially affected had the error not occurred.' " *State v. Weber*, 159 Wn.2d 252, 270, 149 P.3d 646 (2006) (internal quotation marks omitted) (quoting *State v. Bourgeois*, 133 Wn.2d 389, 403, 945 P.2d 1120 (1997)).

When a trial court makes a ruling on an allegation of prosecutorial misconduct, we apply an abuse of discretion standard. *State v. Stenson*, 132 Wn.2d 668, 718, 940 P.2d 1239 (1997).

A. Examination of Mary Logan and the Trial Court's Pretrial Ruling

Beauchamp argues that the State committed misconduct when it questioned Logan about Beauchamp's potential persistent offender status. Beauchamp contends the trial court erred when it denied his related motion for a mistral. We disagree.

Eliciting evidence in a manner contrary to a specific pretrial ruling "clearly . . . constitutes misconduct." *State v. Fisher*, 165 Wn.2d 727, 749, 202 P.3d 937 (2009). Where the defendant objects, or moves for mistrial, on the basis of alleged prosecutorial misconduct, appellate courts will give deference to the trial courts. *Stenson*, 132 Wn.2d at 719. Trial courts are in " 'the best position to most effectively determine if prosecutorial misconduct prejudiced a defendant's right to a fair trial.' " *Id.* (internal quotation marks omitted) (quoting *Luvene*, 127 Wn.2d at 701).

Beauchamp's argument about Logan's testimony is rooted in the trial court's pretrial ruling that excluded "evidence of the Defendant's . . . two prior most serious offense convictions and his status as a persistent offender . . . ." CP at 416. Beauchamp contends that the State violated this pretrial order during the following exchange:

> [State:] Did [Beauchamp] say what he thought might happen to him if he got caught?
> [Logan:] Oh, he'd go to prison forever, you know.
> [State:] Did he mention anything about whether this would be a strike?
> [Logan:] Yes.

14 VRP at 2138.

Beauchamp asserts that this exchange, with its reference to Beauchamp going to prison "forever," "clearly contravened the trial court's ruling" explicitly barring the State from introducing evidence about his potential persistent offender status. Br. of Appellant at 47.

Notwithstanding the instruction to the jury to disregard the testimony about the "strike," Beauchamp argues that the trial court erred when it denied his motion for a mistrial.

We are not persuaded that the questioning violated the pretrial order, especially in light of the instruction to the jury to disregard a portion of the testimony. First, the trial court determined that, in context, the word "forever" did not reveal Beauchamp's status as a potential persistent offender and could have meant, for example, that Beauchamp was more concerned about a long prison sentence because of his age. We agree that the word "forever," as used in the context of the questioning, is ambiguous, particularly coupled with the jury's lack of awareness of Beauchamp's prior strike offenses. Second, the court instructed the jury to disregard Logan's answer about "a strike." Thus, the idea that Beauchamp feared going to jail "forever," without a reference to a "strike," did not unfairly highlight his potential persistent offender status.[9] Therefore, Beauchamp fails to show that the prosecutor committed misconduct by asking the question or that the trial court abused its discretion when it denied Beauchamp's related motion for a mistrial.[10] Thus, Beauchamp's argument that the State committed prosecutorial misconduct during Logan's testimony fails.

---

[9] We note that even assuming the prosecutor committed misconduct by asking specifically about a "strike," Beauchamp cannot show prejudice because the trial court struck the answer and instructed the jury to disregard it. *See State v. Lamar*, 180 Wn.2d 576, 586, 327 P.3d 46 (2014) (" 'Juries are presumed to follow instructions absent evidence to the contrary.' " (quoting *State v. Dye*, 178 Wn.2d 541, 556, 309 P.3d 1192 (2013); *State v. Kirkman*, 159 Wn.2d 918, 928, 155 P.3d 125 (2007))).

[10] Whether Beauchamp's argument about Logan's testimony is framed as a purely prosecutorial misconduct or as an alleged abuse of discretion by the trial court for failing to grant Beauchamp's motion for a mistrial, the result is the same. Because the word "forever" in context was ambiguous and because the trial court instructed the jury to disregard the remainder of Logan's testimony, there was no prosecutorial misconduct and, thus, no reason to grant a mistrial.

B.  IMPROPER STATEMENTS DURING REBUTTAL CLOSING ARGUMENT

Beauchamp also argues that the State committed prosecutorial misconduct during the State's rebuttal argument by mischaracterizing the defense's theory and minimizing its own burden of proof.

"We review a prosecutor's comments during closing argument in the context of the total argument, the issues in the case, the evidence addressed in the argument, and the jury instructions." *State v. Emery*, 161 Wn. App. 172, 192, 253 P.3d 413 (2011), *aff'd*, 174 Wash. 2d 741, 278 P.3d 653 (2012).  And a prosecutor has wide latitude in closing argument to draw reasonable inferences from the evidence and to express such inferences to the jury.  *State v. Hoffman*, 116 Wn.2d 51, 94-95, 804 P.2d 577 (1991).

Prosecutors are permitted to argue that the evidence does not support a defense theory and comments made in rebuttal are evaluated as response to the arguments of defense counsel.  *State v. Russell*, 125 Wn.2d 24, 87, 882 P.2d 747 (1994).  Prosecutors, as advocates, are allowed to make "strong, but fair" responses to defense arguments.  *State v. Brown*, 132 Wn.2d 529, 566, 940 P.2d 546 (1997).  However, prosecutors are not permitted to trivialize the burden of proof or mischaracterize defense counsel's theory.  *See State v. Fuller*, 169 Wn. App. 797, 825, 282 P.3d 126 (2012) (State's burden), *review denied*, 176 Wn.2d 1006 (1013); *State v. Thierry*, 190 Wn. App. 680, 694, 360 P.3d 940 (2015) (mischaracterization of defense theory), *review denied*, 185 Wn.2d 1015 (1016).

1.  Characterization of Defense Argument as a Grand Conspiracy

Beauchamp argues that the prosecutor's rebuttal characterizing defense counsel's argument as a "grand conspiracy" mischaracterized defense counsel's theory of the case, constituting misconduct.  Br. of Appellant at 62.  We disagree.

It is improper for a prosecutor to "misrepresent[] defense counsel's argument in rebuttal, effectively creating a straw man easily destroyed in the minds of the jury." *Thierry*, 190 Wn. App. at 694.  Further, a prosecutor commits misconduct when they, without justification, argue that the accused has alleged the State's witnesses are liars and conspirators.  *State v. Carter*, 74 Wn. App. 320, 330-31, 875 P.2d 1(1994), *aff'd*, 127 Wn.2d 836, 904 P.2d 290 (1995).  However, defendants are not permitted to argue favorable inferences from the evidence and then contend that the State cannot respond to those inferences with offsetting interpretations.  *Russell*, 125 Wn.2d at 93.

Here, Beauchamp points to the prosecutor's repeated references in its rebuttal argument about a grand conspiracy and claims it was "unprovoked and unwarranted."  Br. of Appellant at 64.  Beauchamp argues that he never alleged that any of the witnesses tried to frame him or that there was some sort of a conspiracy.  Beauchamp explains that his defense theory focused on the unreliability of the witnesses' memories, the failure of law enforcement to conduct a proper investigation, and the alternative motives of the witnesses to deviate from the truth and, instead, cast themselves in a more positive light.  Beauchamp contends that his theory did not "alleg[e] the State's witnesses [we]re all in cahoots to put [Beauchamp] away."  Br. of Appellant at 64.  He argues, "Simply attacking the credibility of witnesses" does not warrant the State's labeling of the defendant's theory as a conspiracy.  Br. of Appellant at 64-65.

The State argues that the term "grand conspiracy" was a reasonable response to Beauchamp's defense. Br. of Respondent at 54. In its closing, the State focused on Beauchamp's motive to murder Gover to avoid prison and the evidence that showed he shot her, hid her body, and destroyed her vehicle. Conversely, in Beauchamp's closing, he "told jurors that after Gover's disappearance, people began talking, spreading rumors, and pointing the finger at him." Br. of Respondent at 54. Beauchamp also argued that law enforcement presumed from the beginning that he was guilty. The State argues that describing Beauchamp's argument as a "grand conspiracy" was a "fair summation and response" to the allegation that witnesses lied about his involvement to protect themselves and their friends. Br. of Respondent at 55.

We agree with the State. In context, the term "grand conspiracy" is not an improper mischaracterization of defense's arguments and the manner in which it was presented did not transform defense's theory of the case to an easily overcome "straw man argument." As noted above, Beauchamp referred to the witnesses collectively and suggested they were all lying to potentially protect someone "they actually do care about." 25 VRP at 3998.

> They're all telling stories. They're all filling in the holes. They're all basically responding to what they know, because they're trying to protect themselves. They don't care about anyone other than themselves, and they will say what they have to say to either protect themselves from the robbery or being accused of the robbery, to protect themselves from being accused of the arson, to protect themselves from being accused of the—being involved in chopping up the car. For whatever reason, *they are lying*. They are protecting themselves or someone they actually do care about.

25 VRP at 3998 (emphasis added). With this being the defense's argument, the State's use of "conspiracy" and "grand conspiracy" is a reasonably justified response. Although a "strong" response, it was not unfair to characterize Beauchamp's closing argument that multiple witnesses

28

were lying about his involvement in the crime and that the police "got" witnesses to confirm their theory as a conspiracy.[11] *See Brown*, 132 Wn.2d at 566.

Thus, Beauchamp fails to show the State's conduct in its rebuttal argument was improper or that the trial court abused its discretion by overruling his objections to it.

2. Minimizing State's Burden

Beauchamp next contends that the State improperly minimized its own burden by appearing to encourage the jury to seek a simple answer. The State specifically referenced "Occam's Razor" and suggested to the jury that the "simplest answer" is ordinarily the right one. Beauchamp argues that asking the jury to arrive at the "simplest answer" would risk the jury disregarding the reasonable doubt standard and, in effect, shift the burden onto Beauchamp to provide that simple answer. We disagree.

"Arguments by the prosecution that shift or misstate the State's burden to prove the defendant's guilt beyond a reasonable doubt constitute misconduct." *State v. Lindsay*, 180 Wn.2d 423, 434, 326 P.3d 125 (2014). A prosecutor misstates the State's burden when they trivialize the burden of proof, minimizing " 'the importance of the [beyond a] reasonable doubt standard' " and

---

[11] Beauchamp relies on *Carter*, 74 Wn. App. at 330-31, to support his argument that it is improper for the State to suggest conspiracy is the defense theory when Beauchamp was only making the "straightforward" argument that law enforcement "should have investigated some of the State's witnesses['] motive[s] to testify . . . ." Reply Br. at 41. Beauchamp minimizes his own argument. Viewed in its entirety, it is a fair inference that Beauchamp was suggesting some sort of coordination among the many witnesses and/or law enforcement that greatly exceeds merely arguing that law enforcement should have investigated differently. *Carter* is distinguishable. *See* 74 Wn. App. at 331 (even though the defense commented that certain officers were not at trial, it was misconduct for the State to argue that the defense was suggesting that the officers were involved in conspiracy against the defendant when the defense was a general denial and no conspiracy-type defense was otherwise being raised).

" 'the jury's role in determining whether the State . . . met its burden.' " *Fuller*, 169 Wn. App. at 825 (first alteration in original) (quoting *State v. Anderson*, 153 Wn. App. 417, 431, 220 P.3d 1273 (2009)). " 'When a prosecutor compares the reasonable doubt standard to everyday decision making, it improperly minimizes and trivializes the gravity of the standard and the jury's role.' " *Lindsay*, 180 Wn.2d at 436 (quoting *State v. Lindsay*, 171 Wn. App. 808, 828, 288 P.3d 641 (2012), *reversed*, 180 Wn.2d 423).

We disagree that the State's comments were improper. In the context of the trial as a whole, the prosecutor's comments about "Occam's Razor" appeared to be responsive to Beauchamp's defense theory, not a minimization or shifting of the burden of proof. As noted above, Beauchamp argued that "all" of the witnesses were lying to protect "themselves or someone they actually do care about." 25 VRP at 3998. The idea that this theory would require coordination among the witnesses is a fair response. By using the concept of "Occam's Razor," the prosecutor was pointing out the implausibility of Beauchamp's argument and reinforcing the circumstantial evidence that supports the State's theory of Beauchamp's guilt. Because the State did not use the concept to minimize or shift the burden of proof or to trivialize the jury's role in determining whether the State met this burden, the prosecutor did not commit misconduct, and the trial court did not abuse its discretion by overruling Beauchamp's objection to the State's argument.

III. SUFFICIENCY OF EVIDENCE

Beauchamp argues that there was insufficient evidence to prove that Beauchamp "actually caused Gover's death." Br. of Appellant at 68. We disagree.

We review challenges to the sufficiency of evidence by viewing the evidence in the light most favorable to the State and determining whether a rational trier of fact could have found the

necessary elements of the crime beyond a reasonable doubt. *In re Pers. Restraint of Arntsen*, 2 Wn.3d 716, 724, 543 P.3d 821 (2024). When challenging the sufficiency of the evidence, appellants admit the truth of the State's evidence and all reasonable inferences that can be drawn from that evidence. *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). In evaluating such evidence, circumstantial and direct evidence are deemed equally reliable. *State v. Miller*, 179 Wn. App. 91, 105, 316 P.3d 1143 (2014). We also defer to the trier of fact on issues of conflicting testimony, witness credibility, and the persuasiveness of evidence. *State v. Ague-Masters*, 138 Wn. App. 86, 102, 156 P.3d 265 (2007).

To prove aggravated first degree murder, the State had to prove beyond a reasonable doubt that Beauchamp committed first degree murder, and one or more aggravating circumstances exist. RCW 10.95.020. First degree murder occurs when the defendant, with premeditated intent, causes the death of the victim. RCW 9A.32.030(1)(a). The State also alleged two aggravating circumstances: (1) that Beauchamp killed Gover because she was a prospective witness against him; and (2) he did so to conceal the commission of a crime. RCW 10.95.020(8)(a), (9).

Here, Beauchamp argues the State fell short of proving beyond a reasonable doubt that Beauchamp actually caused Gover's death. Because the trial court never instructed the jury on accomplice liability, Beauchamp argues that the State had to prove that Beauchamp was the person who actually shot Gover. According to Beauchamp, there was no direct evidence Beauchamp pulled the trigger, nor any physical evidence showing Beauchamp was even near Gover when she died. Beauchamp concedes that while he may have had motive and may have been involved in the concealment of her death after the fact (by destroying the green Honda), "those alone are not sufficient to show he made the fatal shot." Br. of Appellant at 73. Ultimately, Beauchamp argues

that in the absence of direct, physical evidence connecting Beauchamp to Gover's death, "[a]ny trier of fact would have to rely on speculation and insinuation to conclude Mr. Beauchamp was the actual cause of Ms. Gover's death." Br. of Appellant at 74.

We are not persuaded. It is true that the State relied primarily on circumstantial evidence to prove Beauchamp killed Gover. But not only is circumstantial evidence deemed as reliable as direct evidence, it was overwhelming here. The evidence included: (1) testimony that Beauchamp had committed the burglary of the Rice residence with Gover, (2) testimony that they decided together to destroy evidence at the residence by committing arson, (3) testimony that Beauchamp overheard law enforcements' request that Gover assist in their investigation of the burglaries and arson, (4) testimony from multiple witnesses that Beauchamp feared being caught and going to jail because of Gover and that she "had to disappear," (5) testimony that Beauchamp was in possession of a gun around the time of Gover's disappearance, (6) cell phone records and testimony placing Gover at Beauchamp's residence the day she disappeared, (7) surveillance footage of Gover driving the green Honda the day she disappeared, (8) the discovery of the green Honda, destroyed in a manner consistent with concealing a crime, (9) testimony that Beauchamp was responsible for destroying the green Honda, and (10) discovery of a tire at the burial site that matched the brand of tire previously attached to the green Honda.

These many pieces of circumstantial evidence show motive, means, opportunity, and consciousness of guilt. Beauchamp's concern about Gover talking to law enforcement, about their involvement in the Rice burglary and arson and that "she had to disappear," supports the inference the Beauchamp had motive to kill Gover and a premeditated intent. The cell phone records and witness testimony establishing Beauchamp was the last person to see Gover alive support a

reasonable inference that he had opportunity to commit the murder. Testimony that he was in possession of a gun around the time of Gover's disappearance supports the inference that Beauchamp had access to means of committing the murder. And Beauchamp's role in the destruction of the green Honda supports an inference that there was consciousness of guilt. Together, especially when all inferences are construed in favor of the State, the evidence is sufficient to reasonably support the conclusion that Beauchamp caused Gover's death. Beauchamp's sufficiency of the evidence claim fails.[12]

CONCLUSION

We affirm Beauchamp's convictions.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
PRICE, J.

We concur:

_____
CRUSER, C.J.

_____
VELJACIC, J.

---

[12] Beauchamp also argues that the cumulative error doctrine warrants reversal of his convictions. Under the cumulative error doctrine, the defendant must show that the combined effect of multiple errors requires a new trial. *State v. Clark*, 187 Wn.2d 641, 649, 389 P.3d 462 (2017). Here, because Beauchamp has failed to establish any error in his trial, the cumulative error doctrine does not apply.